## COX *v.* STATE

[No. 112, October Term, 1948.]

526

*Decided March 10, 1949.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*James R. Compton,* with whom was *Ernest L. Perkins* on the brief, for the appellant.

*Harrison L. Winter, Assistant Attorney General,* with whom were *Hall Hammond, Attorney General, J. Bernard Wells, State's Attorney for Baltimore City,* and *William J. O'Donnell, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal by Richard Cox, appellant, born January 29, 1928, from a judgment and sentence of death for the murder of William Richman in Baltimore City on May 12, 1948.

One Nathan Richman, with his wife, occupied the upstairs front bedroom at 800 Druid Hill Avenue in Baltimore on May 12, 1948. The back bedroom was occupied by the son, William Richman and his wife. About 4:15 a. m. Nathan Richman heard someone opening a window in his bedroom. He called to his son in the back bedroom. Someone came through the window while Nathan was sitting on the bed and told him to "shut up" and used profane language. He said this man had a black gun, his face was covered, and he was wearing a khaki jacket. The son came to the door of the bedroom and Nathan heard a shot. He seized a night lamp, threw it through the window and called for the police. His son was lying in the corner on the floor and the intruder was running out of the room. He said the man who was in the room was the one who fired the shot.

Mrs. Hanna Richman, the wife of William, testified that she and her husband were awakened about 4 a. m. on the morning of May 12, 1948, and heard Mr. Nathan Richman calling her husband by his Jewish name. They both jumped up and her husband ran ahead of her and as he ran in the door he was shot. She then heard a

"scuffling of feet, and I heard a crack. It must have been when Willy was hit on the head, and I started to run. As I reached the doorway, that was the room before their room, this colored fellow ran right by me and I turned and I saw the top of his head as he went down the stairs." The injured man was taken to the hospital at 4:30 a. m. May 12, 1948. He was later operated on and a .45 caliber bullet was removed from his body. He died at 11:25 a. m. on May 14, 1948, of a bullet wound in his chest with generalized peritonitis. Neither Nathan nor Hanna Richman were able to identify the appellant. The wife of Nathan Richman was ill and unable to testify.

A confession of the crime was admitted in evidence, after examination and cross-examination as to its admissibility. According to this confession the appellant told the officers that he realized what he was saying was freely and voluntarily said on his part, that he was not promised anything, beaten, or threatened in any way, and that he wanted to talk about the case. He said he left school in the seventh grade. He also attended a vocational school for about six months and quit when he was sixteen years of age. He had not worked for three months before the commission of the crime. He was in a lunchroom in the early morning of May 12, 1948, listening to records. He had a .45 automatic pistol in his pocket which he had loaded before leaving home. He was walking by the premises at 800 Druid Hill Avenue and saw the upstairs window on the right side open. He knew that Mr. Richman ran the store on the first floor. He found the doors and windows on the first floor locked. He said he wanted to get into the store to get something to eat. He did not know whether any one lived upstairs or not. The reason he loaded the gun was "if anyone was in there I could use the gun to scare them away so I could get out." He did not plan to use the gun on any one unless they prevented him getting out. When he climbed up to the window he saw venetian blinds and thought some one might be living there. He had the gun in his hand at that time. The window was open about two feet and the venetian blinds

in back of the window were all the way down. He reached the window by climbing up the porch next door and putting his foot on the rainpipe. He said he had on an Army jacket, blue pants, navy cap, suede shoes with rubber soles, which were later found in his home. He identified these clothes when shown him by the officer. The suede shoes helped him climp up to the window. He released the safety release on his gun when he was getting ready to "come into the window". He had a blue polka dot handkerchief over his face across the bridge of his nose so that he could not be identified. He pushed the venetian blinds aside and went in the window "head first" at about 4 a. m. He said when he pushed the venetian blinds aside and got into the room "the old man heard me coming, jumped up from the bed and hollered some kind of language I didn't understand and pointed by waving his hands towards the hallway." Cox said he had his hand on the trigger to hold the gun. He said he "didn't say anything to the old man. He was hollering for his son and his son came running out from the other room. The boy turned on the light when he got up, before he came into the old man's room. The young man ran towards me when the old man hollered. I was trying to get out and the son ran into me and we struggled and the gun went off." He was trying to get out of the house. When the gun went off he said that William Richman "was still holding onto the gun but then I swung it and hit him on the head with the barrel." The gun went off once. He said: "I hit him in the head to get him off of me as I didn't know if he was shot or not." He then ran down the steps to the first floor, unlocked the side door and went out. He said that he intended to burglarize the place when he went in. After he got outside he threw the mask away. He walked to the viaduct on Orleans Street and then went home. The next morning he heard people on the street talking about the shooting. He put his gun in the basement and later took it to his brother's house. He did not go home again because he was afraid his finger prints would be found on

the shell that came out of the gun when he shot it.  He left Baltimore the next day and went to Washington where he stayed half a day.  He then went to Philadelphia and stayed for one day, and then returned to Baltimore. The appellant claims that the confession should not have been admitted in evidence because the State failed to meet the burden of proof that it was voluntary.  The State offered the following evidence:  Acting on certain information, Officer Simonsen watched a certain neighborhood about 12:30 a. m. on May 26th and there saw Richard Cox.  He approached Cox and asked him his name.  Cox replied that his name was Eric Johnson. He was then asked where he lived.  He replied 513 Druid Hill.  The officer knew there was no such address as 513 Druid Hill.  The officer asked him who lived on the first floor.  Cox could not answer that question.  He was then placed under arrest and taken to the North Western Police Station.  A stipulation was entered into by the State and the defendant, through his counsel, and was filed in the case.  This stipulation shows that Richard Cox was taken to the North Western Police Station and docketed at 12:35 a. m., May 26, 1948.  He was questioned there by Lieutenant Burk between the hours of 3 a. m. and 5 a. m. on May 26; between 12:30 a. m. and 3:30 a. m., and 6 a. m. and 7:15 a. m. on May 27th; and between 1 a. m. and 4 a. m. on May 28th.  He remained in his cell until 7:50 a. m. on May 28th when he was delivered to Lieutenant Burk.  He made his confession at 10:50 a. m. that day.

The appellant testified, when called only for the limited purpose of showing that his confession was involuntary, that after he was struck twice on the arm and leg with a police club he admitted certain burglaries.  He said after he was beaten and smacked twice by Lieutenant Burk and Officer Simonsen, he was forced to sign the statement about the murder.  He said while he was at the police station he had food and sleep.  When asked when he slept, he said:  "Well, not much, maybe a couple of hours."  On cross-examination as to whether his con-

fession was voluntary, appellant admitted that he did not tell one Christine Reed who visited him at the police station, that he had been beaten. Appellant also admitted that he told the Assistant State's Attorney, when he was questioned before making his confession, that the statement was made freely and voluntarily on his part, that he had not been beaten or threatened in any way, and that he had no complaints about the way he was treated. He said the reason he told this to the Assistant State's Attorney was because he was afraid that he would be taken "back upstairs".

All of the officers connected with the case denied that the accused was beaten or threatened. Evidence was offered to show that the police officers charged with the investigation of the murder were assigned to night duty, and that is why appellant was questioned during the early morning hours. The State also offered evidence to show that when he was taken to various locations in the city it was done at appellant's direction as he wanted to show the officer certain things apparently connected with burglaries and the murder.

At the time the appellant made his confession in this case he had not been charged with killing William Richman and had not been brought before the justice of the peace sitting at the police station.

In England, according to Wigmore, there appear to have been four distinct stages in the history of law regarding use of confessions. In the earliest stage, no further back than the time of the Tudors and the Stuarts, there was no restriction upon the reception of confessions. In the second stage, comprising the second half of the 1700s, the matter of admission of confessions began to be considered and it became recognized that some confessions should be rejected as untrustworthy. In the third stage, comprising the 1800s, the principle of exclusion was developed, under certain influences, to be abnormal extent and exclusion became the rule, admission the exception. In the last stage a reaction sets in here and there, but it represents a future rather than a pres-

ent movement and little is accomplished in the way of changing the law or practice. *Wigmore on Evidence,* 3rd Edition, Sections 817, 818, 819, and 820.

In the case of *Rex v. Voisin,* (1918), 1 K. B. 531; 87 L. J. K. B. 574; 118 L. T. 654; 82 J. P. 96; 34 T. L. R. 263; 62 Sol. Jo. 423; 26 Cox C. C. 224; 13 Cr. App. Rep. 89, C. C. A., part of the body of the deceased was found wrapped in a paper containing the words "Bladie Belgian". The prisoner, not charged with the crime but detained in custody for inquiries, was asked whether he had any objection to writing the two words "Bloody Belgian". He replied: "Not at all" and wrote "Bladie Belgian". It was argued by the defense that the writing was inadmissible in evidence on the ground that it was obtained by the police without having first cautioned the prisoner and while he was in custody. It was said in that case: "It has long been established as a positive rule of English criminal law, that no statement by an accused is admissible in evidence against him unless it is shown by the prosecution to have been a voluntary statement, in the sense that it has not been obtained from him either by fear of prejudice or hope of advantage exercised or held out by a person in authority." The Court further said, in holding this paper admissible, that the question as to whether a person had been duly cautioned before the statement was made is one of the circumstances to be taken into consideraton by the judge, who should exercise his discretion. It could not be said as a matter of law that the absence of a caution makes the statement inadmissible. The Court said that the mere fact that the words were written at the request of police officers while he was being detained at the police station did not make the writing inadmissible in evidence. The Court further said in that case: "It is desirable in the interests of the community that investigations into crime should not be cramped."

In the case of *Rex v. Grayson,* (1921), 16 Cr. App. Rep. 7, C. C. A., the appellant and two other men were convicted for shop-breaking. The police questioned the ap-

pellant before trial and accepted statements of the other two men, both of whom pleaded guilty at the trial implicating appellant. The Court, in reversing conviction, held that the police had no right to examine appellant or to invite statements against him from other persons in custody whose sole aim was to throw blame upon the appellant. The only evidence against him was the statement given at the police station by two other prisoners.

In *Gach v. Rex* (Canada 1943), 2 D. L. R. 417; S. C. R. 250; 79 Can. C. C. 221, it was held that when a person has been arrested, all confessions made by him to a person in authority as a result of questioning are inadmissible in evidence unless a proper caution has been given, because the accused may expect from a person in authority some advantage.

In *Rex v. Lantin* (Canada 1943), 80 Can. C. C. 375, it was held that a caution to the accused which advises him that all he says may be given in evidence against him at his trial is invalid as having the effect of preventing accused from making an exculpatory statement, and a confession or statement made by the accused following such caution is inadmissible. The caution should merely advise the accused that whatever he says may be given in evidence.

It is said in *Wharton's Criminal Law*, 12th Edition, (1932), Volume 1, Section 358: "English rule. Regarding the admissibility and the sufficiency of the confession of the accused to prove the *corpus delicti*, there is an apparent confusion in the English cases due to the text writers. It is well-settled law in England that a voluntary and unsupported confession of guilt, whether made in the course of conversation with private individuals, or under examination before a magistrate, is clearly sufficient to warrant conviction wherever there is independent proof of the *corpus delicti*."

The appellant cites the Charter and Public Local Laws of Baltimore City, 1938, Section 742, which provides in part that whenever any person shall be arrested upon any criminal charge it shall be the duty of the police officer

making the arrest to take the person so arrested before the Justice of the Peace sitting at a station house who may have issued the warrant for such arrest or before whom such warrant is made returnable. If the arrest is made without a warrant it shall be the duty of the police officer to take the person so arrested to the nearest station house and the Justice of the Peace there sitting shall take jurisdiction of the case. Appellant contends that as no warrant had been issued charging the accused with the crime here in question and as he was not taken before the justice of the peace, that the confession offered in evidence should not have been admitted.

He relies strongly on the case of *Upshaw v. United States of America*, 335 U. S. 410, 69 S. Ct. 170, decided December 13, 1948. In that case Upshaw was convicted of grand larceny. Pre-trial confessions of guilt were admitted in evidence. The confessions had been made during a thirty hour period while petitioner was held a prisoner after the police had arrested him on suspicion and without warrant. In reversing the conviction Mr. Justice Black said: "Petitioner's objection to the admissibility of the confessions rested on Rule 5(a) of the Federal Rules of Criminal Procedure, 18 U. S. C. A., and our holding in *McNabb v. United States*, 318 U. S. 332, 63 S. Ct. 608, 87 L. Ed. 819. Rule 5(a) provides that 'An officer making an arrest * * * shall take the arrested person without unnecessary delay before the nearest available' committing magistrate and when the arrested person appears before the magistrate 'a complaint shall be filed forthwith.' Petitioner contended that the officers had violated this rule in detaining him as they did without taking him before a committing magistrate. In the *McNabb* case we held that confessions had been improperly admitted where they were the plain result of holding and interrogating persons without carrying them 'forthwith' before a committing magistrate as the law commands." The Court there further said in Note 2: "Our holding is not placed on constitutional grounds. Since the McNabb rule bars admission of confessions we

need not and do not consider whether their admission was a violation of any of the provisions of the Fifth Amendment."

In the case of *United States v. Mitchell,* 322 U. S. 65, 64 S. Ct. 896, 897, 88 L. Ed. 1140, Mr. Justice Frankfurter, who wrote the opinion in the *McNabb* case, *supra,* after discussing the *McNabb* case in detail, said: "We are dealing with the admissibility of evidence in criminal trials in the federal courts. Review by this Court of State convictions presents a very different situation, confined as it is within very narrow limits. Our sole authority is to ascertain whether that which a state court permitted violated the basic safeguards of the Fourteenth Amendment. Therefore, in cases coming from the state courts in matters of this sort, we are concerned solely with determining whether a confession is the result of torture, physical or psychological, and not the offspring of reasoned choice." In *Townsend v. Burke,* 334 U. S. 736, 68 S. Ct. 1252, 1254, the Court by Mr. Justice Jackson said: "The plea for relief because he was detained as he claims, unlawfully is based on *McNabb v. United States,* 318 U. S. 332, 63 St. Ct. 608, 87 L. Ed. 819. But the rule there applied was one against use of confessions obtained during illegal detention and it was limited to federal courts, to which it was applied by virtue of our supervisory power." We must therefore conclude that the rule laid down in the *McNabb* case and the *Upshaw* case, *supra,* is not applied by the Supreme Court of the United States to cases coming there from the State courts.

It has been stated many times by this Court that before a confession is admissible in evidence the State must show to the satisfaction of the trial judge that it was freely and voluntarily made by the accused, that no force or coercion was exercised to obtain the confession, and that no hope or promise of reward was held out to the accused for the purpose of obtaining it. If, after the court considers the evidence of the State and of the accused as to the admissibility of the confession, the court is of opinion that such confession was freely and volun-

tarily made, it should be admitted. If not, it should be rejected. This rule has been re-announced in detail by this Court in three recent cases. *Demby v. State,* 187 Md. 7, 48 A. 2d 586; *Jones v. State,* 188 Md. 263, 52 A. 2d 484; *Smith v. State,* 189 Md. 596, 56 A. 2d 818.

The mere fact that the accused is under arrest at the time the confession is made does not in itself constitute duress or make such confession inadmissible. Nor does the fact that the prisoner made his confession while in the custody of the police and before he had an attorney of itself make such confession inadmissible. It was said by this Court in the case of *Jones v. State, supra,* 52 A. 2d at page 486: "But the fact that a person makes a confession while in the custody of a police officer, or even while imprisoned under arrest, is not of itself sufficient to render it inadmissible, provided that it was not made as the result of any threat or inducement. *Toomer v. State,* 112 Md. 285, 76, A. 118; *People v. Fitzgerald,* 322 Ill. 54, 142 N. E. 542; *People v. Parsons,* 105 Mich. 177, 63 N. W. 69. And the fact that a prisoner makes a confession while he is without counsel does not of itself render it inadmissible. *McCleary v. State,* 122 Md. 394, 89 A. 1100; *Wright v. State,* 177 Md. 230, 235, 9 A. 2d 253."

It was recently said by this Court in the case of *Courtney v. State,* 187 Md. 1, 48 A. 2d 430, at page 432: "We need not pass upon the question whether the warrant was void; for the purposes of this case the State concedes it, but takes the position that this fact is immaterial. It is perfectly clear under the authorities that the mere fact of arrest does not constitute duress, or render a confession made while under arrest inadmissible, if voluntarily made. *McCleary v. State,* 122 Md. 394, 401, 89 A. 1100; *Toomer v. State,* 112 Md. 285, 76 A. 118; *Young v. State,* 90 Md. 579, 587, 45 A. 531; *United States v. Tod,* 263 U. S. 149, 44 S. Ct. 54, 68 L. Ed. 221; *3 Wigmore, Evidence,* 3d Ed., § 842." And the authorities widely hold that a confession is admissible, if voluntarily made while under arrest, even though the

arrest may be illegal. *Balbo v. People,* 80 N. Y. 484, 499; *State v. Raftery,* 252 Mo. 72, 158 S. W. 585; *People v. Klyczek,* 307 Ill. 150, 138 N. E. 275; *3 Wigmore, Evidence,* 3d Ed. Sec. 823(b); *2 Wharton's Crim. Evidence,* 11th Ed., Sec. 610. Unlike the Supreme Court, this Court and many other courts hold that, except as otherwise provided by statute, (for instance, the Bouse Act), the fact that evidence has been obtained unlawfully does not necessarily make it inadmissible. *Wood v. State,* 185 Md. 280, 285, 44 A. 2d 859. It seems therefore that unless the facts show that the illegal arrest in itself constituted such duress as to make the confession involuntary, the Court must apply the same rule in the admissibility of the confession as where the arrest is legal.

As pointed out many times by this Court, where a confession is offered in evidence and its admissibility is questioned by the accused on the ground that at the time he confessed the crime he was under duress and the confession was obtained by force, threats or inducements, it is for the trial judge to apply the rule hereinbefore stated in determining whether the confession is voluntary. It is for the trial judge to decide whether that confession was voluntarily made before permitting it to be offered in evidence. *Demby v. State, supra; Taylor v. State,* 187 Md. 306, 49 A. 2d 787. In the instant case the accused claims that he was beaten and smacked twice by the officers. This is categorically denied by them and when the Assistant State's Attorney questioned him as to whether his confession was voluntary, as hereinbefore set forth, he made no complaint as to any ill treatment by the officers. He admits that he was fed and he had an opportunity to sleep. We are of opinion that the trial judge was correct in admitting this confession in evidence.

The appellant also contends that as the defendant was never identified as the person who entered the premises and killed the deceased, he should not have been convicted on the confession alone. It has been stated many times by this Court that the weight of the evidence in

a criminal prosecution is a question for the jury, or the trial judge sitting as a jury as in the instant case, and the weight of that evidence cannot be reviewed by this Court on appeal. *Newkirk v. State,* 134 Md. 310, 312, 106 A. 694; *Folb v. State,* 169 Md. 209, 212, 181 A. 225; *Bright v. State,* 183 Md. 308, 318, 38 A. 2d 96; *Slansky v. State,* Md., 63 A. 2d 599.

During the time he was questioned, in the company of Lieutenant Burk and other officers the appellant went to 1809 N. Payson Street, the home of his brother, Millard Cox, and with directions from appellant the officers obtained a black .45 Colt automatic revolver and a box of shells from the front room on the first floor. The Federal Bureau of Investigaion made a report which was offered in the case and which showed that that department was unable to determine whether the .45 bullet found in the body of the deceased had been fired from the .45 revolver found in the appellant's brother's home. Although not presented in the brief, the appellant argued in this Court that the revolver and shells should not have been admitted in evidence. We think there was sufficient probability that this was the revolver with which the deceased was shot, to justify its admission in evidence. The bullet was from a gun of the same caliber as the gun which was found at the place the appellant said it would be found, and in his confession he admitted that he took the gun to the place where it was found and identified it as the gun with which the deceased was killed. Probability is the only requirement. If there is room for doubt, the decision was one on the weight of the evidence and not on any question of admissibility. *Goldstein v. State (Bevans v. State),* 179 Md. 697, 22 A. 2d 471; *Purviance v. State,* 185 Md. 189, 192, 193, 44 A. 2d 474; *Shanks v. State,* 185 Md. 437, 443, 444, 45 A. 2d 85, 163 A. L. R. 931; *Corens v. State,* 185 Md. 561, 572, 45 A. 2d 340.

After the accused was found guilty by the trial judge and before sentence was passed, a medical report was submitted to him. The report showed in part that the

accused, six feet two inches tall and weighing 184 pounds, "is a psychopathic personality who has shown little feeling for the property rights of others and takes the easiest way out when he is confronted with the need for money." He had an I.Q. of 70 and "looks and talks more intelligent than he really is". When asked whether he was sorry for what he did, he replied: "In a way yes and in a way no. I am sorry about being caught. I don't think I did wrong." The question of sentence is one for the trial judge and cannot be passed upon by this Court on appeal. *Duker v. State,* 162 Md. 546, 547 and 548, 160 A. 279; *Walker v. State,* 186 Md. 440, 444 and 445, 47 A. 2d 47.

As we find no error, the judgment and sentence will be affirmed. The appeal being *in forma pauperis,* the costs will be paid by the State of Maryland. (Code 1947 Supplement, Article 5, Section 88A.)

*Judgment affirmed, without costs.*