## KING *v.* STATE

[No. 56, October Term, 1952.]

*Decided January 9, 1953.*

The cause was argued before DELAPLAINE, COLLINS and HENDERSON, JJ.

*U. Theodore Hayes* and *William I. Gosnell,* for appellant.

*Ambrose T. Hartman,* Special Assistant Attorney General, with whom were *J. Edgar Harvey,* Acting Attorney General, *Anselm Sodaro,* State's Attorney for Baltimore City, and *William C. Rogers, Jr.,* Assistant State's Attorney, on the brief, for appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal from a judgment and sentence for the possession of lottery tickets and other lottery paraphernalia. The case comes to this Court on the refusal of the trial judge to exclude certain of this lottery paraphernalia as evidence against the appellant. The appellant and Gladys Traynham were jointly indicted. Gladys Traynham plead guilty to the possession of the lottery paraphernalia, which plea was accepted by the State. The trial then proceeded against King.

The testimony showed that on March 14, 1952, Sergeant Thomas McKenna of the Baltimore Police Department, accompanied by three other officers, McKay, Glass and

Livesay, between 11:15 A.M. and 12:25 P.M., were parked in an automobile in the vicinity of Madison Square in Baltimore. They had in their possession a search warrant authorizing the search of the premises at 1017 North Caroline Street, a three-story brick dwelling, and one automobile bearing Maryland license number 150-378 listed to one Madison King, the appellant here, and another automobile bearing Maryland license number 169-235, listed to one Willard King.

About 12:25 P.M. Sergeant McKenna observed a Chevrolet coach, which he later learned bore Maryland license number 169-235, and operated by the appellant, Madison King, parked on Chase Street, two car lengths west of Caroline Street. After a few minutes he observed Madison King walk south on Caroline Street. He hesitated in front of 1017 Caroline Street, looked back and ascended the steps. Sergeant McKenna said he saw the appellant "put his hands up to the frame as if he may have been ringing the door bell, which I believed he was doing, and I had my car in motion at that time." He said the door of the house opened and after he had given Officer Glass, who accompanied him, certain instructions, Glass jumped from the seat next to him and went up the steps of 1017 Caroline Street as the appellant was being admitted in the front door. Officer McKay had followed Glass out of the car and McKenna heard Glass say: "Just a minute, police." At that time the door was slammed and Glass came "backwards". He started pounding on the door and hollered "police, open up". Then he kicked the door. By that time Sergeant McKenna was on the steps and called out "We are police, we have a search and seizure warrant, open the door". Glass was shouting and banging on the door. Sergeant McKenna said Glass returned to McKenna's automobile where "he got a hammer and struck the door, forced a panel out of it, I guess about a full two minutes being consumed by that time, maybe a little more. I squeezed through the broken panel in the door. * * * I reached in, I couldn't get it unlocked,

and I kept going through the paneling. At that time the defendant, Madison King, was opening the second door. There is a vestibule between the outer front door and there is an inner door, a small vestibule, and he said, what is the trouble. I said we are police, you heard us hollering out here. I ran past him and Gladys Traynham who occupies the first floor of 1017 Caroline Street was in the living room which is to the left of the hallway as you enter. She was about five or six feet from a doorway coming from the direction where a small bathroom was located. There is a flush toilet in that bathroom and that is immediately behind the living room. That toilet was flushing, and when I heard the water I immediately ran in there, but it was just going down in the bottom." He could not identify what went down the toilet. He told Gladys Traynham that he had a search warrant for the premises. She said she had not been in the lottery business "since Captain Emerson got me". Gladys Traynham said that King, who was her friend, brought her a New York Daily Mirror that day and every day. Sergeant McKenna then proceeded to search the living room. He then had a conversation with King in the dining room. King, who had an Armstrong Daily Scratch Sheet, said he was a student at Morgan College and intended to go to the race track but did not go because a friend could not accompany him. He said he came to the apartment to try to get Gladys to trade her small television set for a larger one, and that he came to see her frequently, as they were friends. He said he knew that the officers had been following him but he was not in the lottery business.

Sergeant McKenna then searched the dining room. On top of the dining room table he found a small note book with some notations in it and with an indentation where a piece of paper had been torn out. There were indentations of three numbers. Appellant's attorney admitted, at that point, that Sergeant McKenna was an expert on lottery. The Sergeant said the note book

had indentations where three numbers were written: 951-25; 116-50; and 333-25. He said from his experience "they were three lottery numbers with a dollar played on them had been written on a sheet of paper, and that piece of paper had been torn out and just left the indentations of the pencil on the next sheet". This note book was admitted as State's Exhibit No. 2. He then searched up on the shelf inside a door leading from the dining room and picked up an envelope. On its outside was B-A $17.30. Gladys said the envelope had been there and the note book had been on the table "since Captain Emerson busted me down, I believe she said last August". Sergeant McKenna said in his opinion B-A was the station number and $17.30 indicated the "amount turned into the pick-up man". This envelope was admitted as State's Exhibit No. 3.

He then went to a little table beside a chair in the dining room, on which there was a telephone. He there picked up an envelope that had 610-2; 016-2; and 116-2 on it. He said these were lottery numbers and showed either two cents or two dollars were placed on them. This was admitted as State's Exhibit No. 4. The Sergeant then picked up from beside the telephone three astrological charts. These charts apparently are used frequently in picking lottery numbers. On the outside of one was 919-C 25; 431-C 25. Sergeant McKenna said: "Nine nineteen is a lottery number, and shows a twenty-five cent combination was played on that, and 431 is a lottery number and shows a twenty-five cent combination was played on that. Inside was 919 and 431, 1952 good year." Gladys said she got "the charts at Schulte-United, and a woman wrote those up there at Schulte-United when I got it". These were admitted as State's Exhibit No. 5. On the table beside the telephone the Sergeant found an envelope, addressed to Mr. William McKay Traynham, 1017 North Caroline St., containing computations by which the winning of lottery numbers are determined from the results of horse races. This was admitted in evidence as State's Exhibit No. 6.

Sergeant McKenna then gave Officer McKay certain instructions as a result of which McKay went to the Chevrolet automobile, Maryland license number 169-235, which King had driven and from which he had alighted just before he went in the house. McKay testified that he found in this automobile four bags which he brought back to the apartment. McKenna asked King what they were and King replied that they belonged to him and were filter bags for small vacuum cleaners which he sold. Sergeant McKenna indicated to him lottery numbers written on a bag. King said he knew nothing about the numbers, that he did not write them, that he was not in the lottery business, and that the bags could have been left by him with prospective purchasers of vacuum cleaners and later picked up by him if the customer became dissatisfied. When asked by McKenna why he had slammed the door in Officer Glass' face and knocked all the skin off of his leg and caused it to bleed, King replied that he did not do it intentionally. The four filter bags were offered as State's Exhibit No. 7. The other officers corroborated in effect the testimony of Sergeant McKenna. King denied that he had any knowledge or possession of the lottery paraphernalia.

Appellant contends that because items, State's Exhibits 2, 3, 4, 5 and 6, *supra,* were found in the apartment of Mr. and Mrs. Traynham and not in his possession; because none of the handwriting was his; because Mrs. Traynham did not accuse him of having knowledge of these exhibits; because he explained his presence in the apartment; and because he denied all connection with these exhibits, he having objected to their admission; that they should not have been admitted in evidence against him.

Of course, for evidence to be admitted against an accused it must be shown to be connected with the accused. In *Goldstein v. State* and *Bevans v. State,* 179 Md. 697, 22 A. 2d 471, 472, articles were thrown from a car being followed by the police who subsequently looked at the place where the articles were thrown,

and found gloves and some skeleton keys. It was argued there that the evidence of throwing at the spot and the subsequent finding was not sufficient to connect the accused with the articles found. In denying that contention, Chief Judge Bond said: "But the court considers the connection sufficiently evidenced for that purpose. Nothing was lacking to a complete showing of connection except testimony that the men had the articles in their possession previously. Probability is the only requirement, however, and here the probability amounts to little short of certainty. And if there was any room for doubt, the decision was on the weight of the evidence, not on any question of admissibility." This principle has been followed in later cases, among which are *Cox v. State,* 192 Md. 525, 64 A. 2d 732; *Edwards v. State,* 194 Md. 387, 71 A. 2d 487; *Purviance v. State,* 185 Md. 189, 193; *Freedman v. State,* 195 Md. 275, 286, 73 A. 2d 476, 481; *Lingner v. State,* 199 Md. 503, 507, 86 A. 2d 888, 890.

In *Hayette v. State,* 199 Md. 140, 85 A. 2d 790, number slips were found in a cardboard box in an oil tank which contained trash, in appellant's back yard. When they were shown to appellant he said they could be a month old and he denied any knowledge of how the slips got there. It was argued that the contents of the cardboard box were not admissible in evidence against him because there was no evidence to connect them with appellant. In holding the evidence admissible, this Court quoted from *Goldstein v. State* and *Bevans v. State, supra,* and also said: "Incidentally we may say that much of the testimony of appellant * * * and of some of his codefendants, relied on by him, is on its face readily 'disbelievable'. Ordinarily disbelieving evidence is not the same thing as finding evidence to the contrary. But on questions of scienter reason for disbelieving evidence denying scienter may also justify finding scienter. *Shelton v. State,* 198 Md. 405, 411-412, 84 A. 2d 76, 80." In *Moore v. State,* 199 Md. 677, 87 A. 2d 577, Susie Moore was indicted under the lottery laws. It was said in

that case 199 Md. at page 681, 87 A. 2d at page 579: "There is, of course, no direct testimony of her participation in the lottery, but it is not necessary in order to support a conviction under these counts that she be shown to be a principal; all that need be shown is scienter, * * *" See also *Brown v. State*, 200 Md. 211, 215, 88 A. 2d 469, 470. *Wild v. State*, 201 Md. 73, 92 A. 2d 759.

Here, appellant's actions in running to the door after he was called by the officers; his slamming of the door on Officer Glass' leg; requiring the officers to break down the door to gain admittance; his testimony as to the purpose of his visit which conflicts with the statement made by Gladys Traynham; his daily visits to the apartment; and the finding of a bag with lottery writings on it in the car operated by him, were sufficient to show the necessary connection between the appellant and the disputed evidence. Probability being the test, the evidence was properly admitted.

Finding no error, the judgment will be affirmed.

*Judgment affirmed, with costs.*