629 A.2d 1251

**Robert Alan HOF**

v.

**STATE of Maryland.**

**No. 952, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

Sept. 1, 1993.

Certiorari Granted Dec. 10, 1993.

James Wyda, Asst. Public Defender (Stephen E. Harris, Public Defender on the brief), Baltimore, for appellant.

David P. Kennedy, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Sandra A. O'Connor, State's Atty. for Baltimore County, Towson, on the brief), for appellee.

Submitted before MOYLAN, CATHELL and MOTZ, JJ.

MOYLAN, Judge.

This appeal poses a most basic question: Does there even exist such a thing as *a law* of confessions? Or is it the case that there are, rather, *many laws* of confessions? Be the law of confessions single or multiple, the burden is, in any event, indisputably on the State to satisfy the trial judge in the first instance that a challenged confession is admissible. It is a legitimate and increasingly popular defense strategy to exploit that allocation of the burden by constructing as arduous an obstacle course as possible for the State to negotiate.

In pursuit of that strategy, the resourceful defense attorney may well challenge a proffered confession, giving as grounds therefor: 1) that it did not satisfy the common law requirement of voluntariness; 2) that it did not satisfy the general due process requirement of the Fourteenth Amendment; 3) that it did not satisfy the parallel due process requirement of Article 23 of the Maryland Declaration of Rights; 4) that it did not respect the defendant's Fifth Amendment's privilege against compelled self-incrimination; 5) that it did not respect the defendant's parallel privilege under Article 22 of the Maryland Declaration of Rights; 6) that it did not abide by the constitutionally imposed implementing rules of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and 7) that it did not guarantee the assistance of counsel secured by the Sixth Amendment.

Having designed such a multi-layered defense in depth, the defense attorney may then sit back and watch. Somewhere in the course of its Herculean labors, the State may fail to clear a barrier. A more likely scenario is that somewhere along the way, the State or the judge may neglect even to notice the presence of a hurdle. The strategy is legitimate. The mischief, of course, is that some of the proposed hurdles may turn out to be redundant. The trial may trip over an obstacle that should never have been in its path.

Just as it is the adversarial prerogative to lay a procedural mine field, it is the appellate responsibility to clear the ground of gratuitous hazards. The law should vigilantly guard against needless proliferation of ultimately indistinguishable rules, tests, doctrines, and burdens. The law need not suffer two or three explanations for two or three seemingly different phenomena to remain in the field if it can construct a single explanation for what are but specific instances of the same general phenomenon. For those who mold the law, an ongoing mission should be to eliminate clutter whenever possible by reducing to the lowest common denominator—by searching constantly for a unified field theory. This is the challenge set for us by the appellant's first contention in the present case.

Lest the hypothetical obstacle course suggested above be dismissed as unrealistic, we draw attention to the omnibus gauntlet tossed down before the trial judge by the appellant here:

> "Well, I am alleging all of the grounds, your Honor. The violation of the Maryland Confession Law, Article 27, Declaration of Rights, 5th and 14th Amendments and *Miranda.*"

The appellant, Robert Alan Hof, was convicted by a Baltimore County jury, presided over by Judge Leonard S. Jacobson, of armed robbery and a related handgun offense. He raises, *inter alia*, the contention that Judge Jacobson erroneously failed to instruct the jury adequately on the subject of the common law voluntariness of a confession.

### Stating the Problem

At a pretrial suppression hearing, Judge Jacobson had ruled that the confession was admissible. At trial, the jury was informed of the circumstances surrounding the taking of the confession. At the close of the case, Judge Jacobson instructed the jury as to what it must find to determine for itself the acceptability of the confession. The first part of that instruction covered the giving of the familiar *Miranda* warnings and the waiver thereof:

> "You've also heard evidence that the defendant confessed that he committed the crime with which he is charged or the crimes with which he is charged. You are instructed that you must be satisfied beyond a reasonable doubt that the defendant was clearly advised of each of his rights before making a confession while in custody and while undergoing interrogation; otherwise, you are to disregard the alleged confession.

> The defendant must have been specifically advised that he has a right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney during any questioning and that, if he cannot afford an attorney, one will be appointed for him prior to any questioning, if he so desires.

> You must be satisfied beyond a reasonable doubt that the defendant understood his rights and knowingly and willingly waived his rights prior to making a confession."

Judge Jacobson then turned to the closely intertwined concepts of 1) the confession's being voluntary 2) by virtue of the *Miranda* waiver's being voluntary. He concluded with the admonition that the State's proof of the voluntariness of the confession had to satisfy the jury beyond a reasonable doubt:

> "The fact that warnings were given does not automatically render a subsequent confession valid. The defendant must have knowingly and intelligently waived his rights. *If such a waiver was not made, a confession made during custodial investigation is not a voluntary one.* If you have a reasonable doubt as to whether the defendant was properly ad-

vised of his rights and waived or gave up those rights, then you must not consider the confession as part of the evidence in arriving at your verdict.

And *the burden is on the State to prove beyond a reasonable doubt that the alleged confession was freely and voluntarily made.*" (emphasis supplied).

The appellant was not satisfied. He requested a further instruction cataloging an assortment of factors that might bear on voluntariness:

"And tell them what they have to consider—the length of time the defendant was questioned, physical and mental condition, period of time that elapsed between being advised, other persons present at the time of making the alleged confessions, all the other circumstances surrounding, including the age, background, education, experience, intelligence. And then say that the burden is on the State to prove beyond a reasonable doubt that the confession was freely and voluntarily made and without any threats, implied or direct, and that it's not voluntary if there's any inducement or promises of leniency, and unless this is done, that it must be disregarded."

The thrust of the appellant's argument is that for a confession to be admissible, it must satisfy not only the dictates of *Miranda v. Arizona,* but also the demands of common law voluntariness. Thus far, of course, the appellant is right. The more pertinent question, however, is whether in the context of custodial interrogation, the satisfaction of *Miranda* does not, *ipso facto,* satisfy the requirements, of common law voluntariness in the process. The procedural obligation to touch all the bases does not include an obligation to touch third base twice.

### Reducing the Field

To answer that question, it is necessary to make several comparisons. As we prepare to make those comparisons, it will be helpful if we reduce some of the clutter. A challenge to a confession in Maryland today could theoretically be made

on any of at least seven ostensibly different grounds. It could be alleged that there was a failure to satisfy:

1. Common law voluntariness (applicable in Maryland)

2. Due process under the federal Fourteenth Amendment

3. Due process under Article 23, Maryland Declaration of Rights

4. The Fifth Amendment privilege not to be compelled to be a witness against oneself

5. The privilege against compelled self-incrimination under Article 22, Maryland Declaration of Rights

6. The judicially devised implementing rules of *Miranda v. Arizona*

7. The right to counsel under the Sixth Amendment[1]

To what extent are those seven criteria no more than different ways of testing the same thing, on the one hand, or ways of testing quite different things, on the other hand?

At the outset, we can eliminate from any further comparison the challenge to a confession based upon the Sixth Amendment's right to the assistance of counsel. It is unique. It possesses virtually no overlap with any of the other grounds for challenging a confession. *McNeil v. Wisconsin*, 501 U.S. ——, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991). It has its own triggering mechanism (the fact of accusation). *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); *Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986); *Illinois v. Perkins*, 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990). It is indifferent to whether the

---

1. The omnibus Article 21 of the Maryland Declaration of Rights includes the provision "That in all criminal prosecutions, every man hath a right ... to be allowed counsel." We are aware of no case that has ever held this provision of Article 21 to be *in pari materia* with its Sixth Amendment counterpart. Neither are we aware of any case that has ever analyzed the admissibility of a challenged confession in terms of compliance with Article 21. There was, to be sure, one faint glimmer of an attempt, *en passant*, to invoke Article 21 in *Audler v. Kriss*, 197 Md. 362, 367–368, 79 A.2d 391 (1951). It was, however, summarily extinguished as a nonfactor in the totality of circumstances affecting voluntariness.

suspect being questioned is or is not in custody. *Maine v. Moulton,* 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985); *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). It may be violated by the most voluntary of confessions under the most noncompelling of circumstances. *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). It is, truly, *sui generis.*

We may also eliminate from any further comparison, for a very different reason, challenges to a confession based on either Article 23 or Article 22 of the Maryland Declaration of Rights. As a practical matter, they are never used. Substantively, moreover, they are redundantly coterminous with their federal counterparts.

Article 23 is Maryland's due process clause, notwithstanding its more archaic usage of "the Law of the Land." Numerous cases over the decades have held Article 23 to be *in pari materia* with the due process clause of the Fourteenth Amendment (and, incidentally, with the due process clause of the Fifth Amendment as well). *Balto. Belt R.R. v. Baltzell,* 75 Md. 94, 23 A. 74 (1891); *Solvuca v. Ryan & Reilly Co.,* 131 Md. 265, 101 A. 710 (1917); *Oursler v. Tawes,* 178 Md. 471, 13 A.2d 763 (1940); *Anne Arundel County Commrs. v. English,* 182 Md. 514, 35 A.2d 135 (1943) *overruled on other grounds, Weaver v. Prince George's County,* 281 Md. 349, 363, 379 A.2d 399 (1977); *Colgan v. Bd. of County Commrs.,* 21 Md.App. 331, 320 A.2d 82 (1974). We are aware of no case that has actually utilized Article 23 as the basis for determining the admissibility of a challenged confession in Maryland. Although there is no theoretical reason why it is not available as a basis for challenge, it is coterminous with the due process clause of the Fourteenth Amendment. It is, therefore, clear that the fortunes of a confession would rise or fall under Article 23 precisely as they would under the Fourteenth Amendment.

Article 22 is Maryland's privilege against compelled self-incrimination. It also, over the decades, has been held to be *in pari materia* with its federal counterpart, the Fifth Amend-

ment privilege against being compelled to be a witness against oneself. *Blum v. State*, 94 Md. 375, 382–383, 51 A. 26 (1902); *Bass v. State*, 182 Md. 496, 500–501, 35 A.2d 155 (1943); *Adams v. State*, 202 Md. 455, 460–463, 97 A.2d 281 (1953), *rev'd on other grounds*, 347 U.S. 179, 74 S.Ct. 442, 98 L.Ed. 608 (1954); *Brown v. State*, 233 Md. 288, 296, 196 A.2d 614 (1964); *State v. Panagoulis*, 253 Md. 699, 707, 253 A.2d 877 (1969). We are aware of no case that has actually utilized Article 22 as the basis for determining the admissibility of a challenged confession in Maryland. Although, as in the case of Article 23, there is no theoretical reason why it is not available as a basis for challenge, it is coterminous with the Fifth Amendment privilege now binding on the states. It is, therefore, clear that the fortunes of a confession would rise or fall under Article 22 precisely as they would under the Fifth Amendment.

For purposes of present analysis, then, our field of study is reduced to four objects:

1. Common law voluntariness
2. Fourteenth Amendment due process
3. Fifth Amendment privilege
4. The implementing rules of *Miranda v. Arizona*

### A Tentative Further Reduction

As a temporary facilitation, we may reduce the field of study yet further by placing to the side, for the moment at least, *Miranda v. Arizona*. The other three standards— common law voluntariness, due process, and the privilege against compelled self-incrimination—protect basic liberties deeply imbedded in the Anglo–American tradition. *Miranda*, on the other hand, is, by its own terms, an expedient, serving a need until some equally effective means of implementation should be developed. It is a set of judicially created rights, warnings, and advisements, having no inherent vitality of their own but designed to implement something else that does have independent vitality. Again, by its own express terms, *Miranda* is designed to implement the Fifth Amendment privi-

lege against being compelled to be a witness against oneself. It does not, to be sure, implement that privilege in all circumstances. It is fashioned, rather, to implement the privilege only in the special circumstance of custodial interrogation, a special circumstance, to be sure, of broad concern to the criminal law.

If it should be the case that common law voluntariness and Fourteenth Amendment due process are distinct, in terms of their ultimate content, from the Fifth Amendment privilege, *Miranda* does not pretend to implement them, even in the circumstance of custodial interrogation. If, on the other hand, our comparison should reveal that the common law voluntariness requirement, the Fourteenth Amendment due process clause, and the Fifth Amendment privilege are but three different ways of expressing the same protection, then the implementation of one of them in the setting of custodial interrogation would, *ipso facto,* implement them all in that setting.

What, then, is the relationship, if any, among common law voluntariness, Fourteenth Amendment due process, and the Fifth Amendment privilege?

### *The Common Source*

The common source of all Anglo–American law—common law and constitutional law alike—regulating the admissibility of challenged confessions is the English common law on the subject, which began developing in the early 1600's and began taking on many of its present characteristics in the latter part of the 1700's. Dean Wigmore traces the history of confession law in III *Wigmore on Evidence* §§ 817–820d, at 291–308 (Chadbourne Rev.1970) (hereinafter *Wigmore* ). After describing how confessions were generally admitted with little question during the 1600's and up to the middle of the 1700's, *Wigmore* notes a sea change in attitude illustrated by *Rudd's Case,* 1 Leach Cr.C. 115, 118, 168 Eng.Rep. 160, 161 (1775) and *Rex v. Warickshall,* 1 Leach Cr.C. 263, 265, 168 Eng.Rep. 234, 234–235 (1783).

In *Rudd's Case,* Lord Mansfield observed, "The instance has frequently happened, of persons having made confessions under threats or promises: the consequence as frequently has been, that such examinations and confessions have not been made use of against them on their trial." *Wigmore* notes, at 297, that in *Rex v. Warickshall,* "the modern rule received a full and clear expression, and confessions not entitled to credit because of the promises or the threats by which they had been obtained were declared inadmissible in evidence." In *Rex v. Warickshall,* 1 Leach Cr.C. at 263–264, Baron Eyre had observed:

"[A] confession forced from the mind by the flattery of hope, or by the torture of fear, comes in so questionable a shape when it is to be considered as the evidence of guilt, that no credit ought to be given to it."

Between the latter part of the 18th Century and the middle years of the 19th Century, one further change occurred. It did not, however, affect the criteria for admissibility. The change was in the undergirding rationale for excluding involuntary confessions. During the earlier period, that exclusion had been based exclusively on the notion that a confession induced by threats or promises was likely to be untrustworthy. By the middle of the 19th Century, however, the English and American courts alike acknowledged that involuntary confessions would be excluded because of their involuntary character alone, quite aside from any question of whether they were untrustworthy. Although Wigmore was critical of the change in rationale, he described the controlling criterion:

"Thus by the middle of the 1800s the phrase came to be regarded, by many judges, as sufficient in itself; and the test was frequently laid down that *any* threat or promise, *any* fear or hope, would exclude a confession made in consequence of it—that is, would exclude the confession irrespective of any attempt to measure its influence to cause a false confession." (emphasis in original).

*Wigmore* § 825, at 346.

In addition to citing numerous English cases, *Wigmore* quoted from the two leading authorities on the Law of Evi-

dence in the early 19th Century: Starkie, 2 *Evidence* 48–49 (1824) and Phillipps, *Evidence* 11 (1814).

*McCormick on Evidence* § 146, at 372 (E.W. Cleary 3d ed. 1984) (hereinafter *McCormick* ), retraces the same history and arrives at the same verdict. Before turning to what he calls "the federal 'constitutionalization' of the voluntariness requirement," which caused the same standard at the state level to suffer an inevitable academic and judicial neglect, he notes the near universal acceptance of the common law standard of voluntariness:

> "In most if not all jurisdictions the requirement of voluntariness became and probably remains a mandate of nonconstitutional evidence law."

W. LaFave & J. Israel, *Criminal Procedure* § 6.2, at 264 (1985), describes the common law voluntariness test:

> "[I]t became more common for the courts simply to ask whether the confession had been made 'voluntarily,' that is, without certain improper inducements. These included actual or threatened physical harm, a promise not to prosecute, a promise to provide lenient treatment upon conviction, and deceptive practices so extreme that they might have produced a false confession."

This general common law on the voluntariness of confessions was first received in Maryland in 1873 in *Nicholson v. State,* 38 Md. 140 (1873), and was first received by the Supreme Court, eleven years later, in *Hopt v. People of Terr. of Utah,* 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262 (1884). It is the intention of this opinion to show that both Maryland in 1873 and the Supreme Court in 1884 received and accepted precisely the same common law test with respect to the voluntariness of confessions.

### The Federal Reception

The first occasion the Supreme Court had to consider a challenge to the admissibility of a confession was in *Hopt v. Utah.* It adopted as its standard the general common law of evidence in that regard. It quoted with approval Baron Eyre

in *Rex v. Warickshall*, one of the key authorities relied on by *Wigmore* in describing the common law as it had by then developed. In addition to 1 Greenleaf, *Evidence* § 215 and 1 Archibald, *Criminal Pleading* 125, the Supreme Court relied upon the early English masters later cited in *Wigmore:* Starkie, *Evidence* 73 and 1 Phillips, *Evidence* 533–534. A key authority utilized by the Supreme Court, and also relied on heavily in the early Maryland cases, was Baron Parke in *Regina v. Baldry*, 2 Denison Cr.C. 428, 443 (1852).

The Supreme Court clearly utilized the standard common law test of voluntariness, as it recited:

> "So far as witness knew, the bill of exceptions states 'the confession was voluntary and uninfluenced by hopes of reward or fear of punishment; he held out no inducement, and did not know of any inducement being held out to defendant to confess.' This was all the evidence showing or tending to show that the confession was voluntary or uninfluenced by hope of reward or fear of punishment."

*Hopt*, 110 U.S. at 584, 4 S.Ct. at 207. The Court stated that a "confession, if freely and voluntarily made, is evidence of the most satisfactory character," *Id.*, but then pointed out that a confession would not be received in evidence if it "appears to have been made either in consequence of inducements of a temporal nature, held out by one in authority, touching the charge preferred, or because of a threat or promise by or in the presence of such person, which, operating upon the fears or hopes of the accused, in reference to the charge, deprive him of that freedom of will or self-control essential to make his confession voluntary within the meaning of the law." *Hopt*, 110 U.S. at 585, 4 S.Ct. at 207. The Supreme Court found the confession in that case "to be voluntary."

It is undisputed that the test adopted by the Supreme Court was the general common law test of voluntariness. *McCormick*, at 372, characterizes *Hopt v. Utah* as having done just that:

> "In its first confession case, Hopt v. Utah, *the Supreme Court* of the United States *accepted*—apparently as a mat-

ter of federal evidence law governing the conduct of criminal trials in federal court—*the well-developed common law requirement of voluntariness.*" (footnote omitted) (emphasis supplied).

To the same effect, *see* Note, *Developments in the Law—Confessions,* 79 Harv.L.Rev. 935, 959 (1966):

"In *Hopt v. Utah,* the Court affirmed a murder conviction resting in part on a challenged confession. *Relying on Regina v. Baldry and several text writers, it held the confession 'voluntary within the meaning of the law,'* and therefore admissible, because not given 'in consequence of inducements of a temporal nature, held out by one in authority, touching the charge preferred, or because of a threat or promise by or in the presence of such person. . . .'" (footnote omitted) (emphasis supplied).

Saltzburg, *American Criminal Procedure* 410 (1980), described the action of the Supreme Court in *Hopt v. Utah:*

"*It explicitly recognized that there was a common law rule prohibiting the use of confessions obtained by inducements, promises and threats.* Because of their inherent unreliability, such confessions were not admitted into evidence. The same desire to prevent erroneous convictions *led the Court to cite treatises on evidence and to follow the common law rule.* " (emphasis supplied).

In the wake of *Hopt v. Utah,* the Supreme Court continued to use common law voluntariness as its test for the admissibility of a confession. In *Sparf v. United States,* 156 U.S. 51, 55, 15 S.Ct. 273, 275, 39 L.Ed. 343 (1895), the Supreme Court held that several confessions were admissible because they were "entirely free and voluntary, uninfluenced by any hope of reward or fear of punishment." The Court there relied on *Hopt v. Utah, Regina v. Baldry,* and *Rex v. Warickshall. See also Pierce v. United States,* 160 U.S. 355, 16 S.Ct. 321, 40 L.Ed. 454 (1896); *Wilson v. United States,* 162 U.S. 613, 623, 16 S.Ct. 895, 899, 40 L.Ed. 1090 (1896) ("[T]he true test of admissibility is that the confession is made freely, voluntarily and without compulsion or inducement of any sort.").

What the Supreme Court was utilizing as of 1884 was indisputably the general common law as to voluntariness, which had developed in England between 1775 and 1850 and the history of which has been thoroughly chronicled by *Wigmore.*

### *The Maryland Reception*

**A. 1873–1936:**

In receiving the English common law on the required voluntariness of a confession, Maryland preceded the Supreme Court by eleven years. In affirming the decision of a trial judge to admit a confession, *Nicholson v. State,* 38 Md. 140, 153 (1873), articulated for the first time in this state the general common law test for admissibility:

> "[I]t is very clear upon all the authorities, that if the confession of the appellant had been induced by any threat of harm, or promise of worldly advantage held out to him . . ., it ought to be excluded."

The Court of Appeals went on to point out that the law was also well settled that the burden was upon the prosecutor to show that the confession "was not made in consequence of an improper inducement." *Id.* The relatively summary adoption by Maryland of this general principle cited only as its authorities the opinion of Baron Parke in *Regina v. Warringham,* 2 Denison Cr.C. 447 (1851), and 1 Taylor § 796. (Judge Pitt Taylor was a widely recognized English authority on the Law of Evidence, whose first edition was published in 1848 and whose work ultimately went through no less than eleven editions.) In P. Taylor, *A Treatise on the Law of Evidence, as Administered in England and Ireland (with illustrations from the American and other foreign laws)* § 796, at 777–778 (6th ed. 1872), both the common law test of voluntariness and the allocation of the burden of proof with respect to it were well stated:

> "Before any confession can be received in evidence in a criminal case, it must be shown to have been *voluntarily* made; for, to adopt the somewhat inflated language of Chief

Baron Eyre, 'a confession, forced from the mind by the flattery of hope, or by the torture of fear, comes in so questionable a shape, when it is to be considered as the evidence of guilt, that no credit ought to be given to it; and therefore it is rejected.' The material question, consequently, is, whether the confession has been obtained by the influence of hope or fear; and the evidence to this point, being in its nature preliminary, is, as we have seen, addressed to the judge, who will require the prosecutor to show affirmatively, to his satisfaction, that the statement was not made under the influence of an improper inducement, and who, in the event of any doubt subsisting on this head, will reject the confession." (footnotes omitted) (emphasis in original).

*Wigmore,* in the monumental third edition, cites *Nicholson v. State,* as one of a dozen American state decisions utilizing the absence of a "threat or promise" as a measuring rod for common law voluntariness. 3 *Wigmore on Evidence* § 826 at n. 2 (1940). It also cites as an example the Supreme Court decision of *Wilson v. United States,* 162 U.S. 613, 16 S.Ct. 895, 40 L.Ed. 1090 (1896), confirming that Maryland and the Supreme Court were, indeed, both utilizing the same English common law test.

Fourteen years after the *Nicholson* decision, the Court of Appeals next utilized the common law test for voluntariness in *Biscoe v. State,* 67 Md. 6, 8 A. 571 (1887). It cited as its authority not only the *Nicholson* decision but also the prominent English decision of *Regina v. Baldry,* 2 Denison Cr.C. 428 (1852), a case referred to frequently by *Wigmore* in its analysis of the common law test. The case of *Regina v. Warringham,* which had been relied on by *Nicholson,* was, indeed, a summary decision published as an *addendum* to *Regina v. Baldry* simply because of the references to it in *Regina v. Baldry. Regina v. Baldry* was also replete with references to Judge Pitt Taylor and his work on evidence, also one of the authorities relied on by *Nicholson. Biscoe v. State* additionally relied on the English decision of *Regina v. Garner,* 2 Carr. & K. 920, a decision that received a full discussion

in *Regina v. Baldry.* Two other authorities on which *Biscoe* prominently relied were *Rex v. Kingston,* 4 Car. & P. 387 (1830) and *Rex v. Partridge,* 7 Car. & P. 551 (1836), both of which were cited by Dean Wigmore in his description of the common law test.

In *Biscoe,* 67 Md. at 7, 8 A. 571, the statement of the rule was in full accord with the general common law version of the rule:

"Now all agree that a confession is not admissible in evidence against the prisoner, unless it was freely and voluntarily made. There is no difficulty in regard to the rule itself, the trouble is in the application of the rule to the facts of each particular case, that is, whether it was a free and voluntary confession, or whether it was procured by the influence of another under a hope of favor or advantage if made, or fear of harm or disadvantage of some kind if withheld."

*Ross v. State,* 67 Md. 286, 10 A. 218 (1887) and *Rogers v. State,* 89 Md. 424, 43 A. 922 (1899), were routine applications of the common law test, citing only *Nicholson* and *Biscoe* as their authorities. *Young v. State,* 90 Md. 579, 45 A. 531 (1900) was also a routine application, but in addition to its reliance on *Biscoe, Ross,* and *Rogers,* it also cited as authority *Regina v. Baldry,* and, significantly, *Pierce v. United States,* 160 U.S. 355, 16 S.Ct. 321, 40 L.Ed. 454 (1896), one of the Supreme Court's applications of the common law test.

*Green v. State,* 96 Md. 384, 386, 54 A. 104 (1903), expressed the voluntariness test in slightly different words without altering in any respect the content:

"The law imposes the condition, upon the admitting of [confessions] in evidence, that they be not induced by threats or by promise of advantage to be derived from making them; and the burden of showing affirmatively that they were not so induced to be made in any given case is upon the prosecutor. *Nicholson v. State,* 38 Md. 140."

*Watts v. State,* 99 Md. 30, 35–36, 57 A. 542 (1904), is interesting not so much because it reversed a conviction for

the failure of the State to prove that the confession in issue was "freely and voluntarily made" but for the authorities it cites. In addition to routine reliance on *Green v. State* from the year before and on *Nicholson,* it quoted, with approval, Baron Parke in *Regina v. Warringham,* 2 Denison Cr.C. 448, and then, for the first time in Maryland law, cited as authority for the common law test in Maryland the then recent Supreme Court decision of *Bram v. United States,* 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897).

From 1906 through 1936, when the Supreme Court in *Brown v. Mississippi,* 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936), first used the Due Process Clause of the Fourteenth Amendment to review a challenged confession in a conviction coming from a state court, Maryland continued to apply the common law test of voluntariness without altering it in any way. *Birkenfeld v. State,* 104 Md. 253, 65 A. 1 (1906); *Toomer v. State,* 112 Md. 285, 292, 76 A. 118 (1910); *Deems v. State,* 127 Md. 624, 630, 96 A. 878 (1916); *Cothron v. State,* 138 Md. 101, 113 A. 620 (1921); *Robinson v. State,* 138 Md. 137, 113 A. 641 (1921); *Dobbs v. State,* 148 Md. 34, 58–61, 129 A. 275 (1925); *Rasin v. State,* 153 Md. 431, 440–441, 138 A. 338 (1927); *Carey v. State,* 155 Md. 474, 477, 142 A. 497 (1928).

During that period, the most interesting case, for present purposes, was *McCleary v. State,* 122 Md. 394, 401, 89 A. 1100 (1914), for its citation of *Sparf v. United States,* 156 U.S. 51, 15 S.Ct. 273, 39 L.Ed. 343 (1895) and *Pierce v. United States,* 160 U.S. 355, 16 S.Ct. 321, 40 L.Ed. 454 (1896), as authority for the common law test in Maryland. Those were cases applying the common law test as adopted by the Supreme Court in *Hopt v. Utah.* In discussing the burden upon the State of "showing that a confession of crime has not been obtained by improper means, that it is the voluntary action [of the suspect], uninduced by hope of favor or fear of harm," *McCleary* cited five cases as authority: the four earlier Maryland decisions of *Nicholson, Green, Watts,* and *Toomer,* and the Supreme Court decision of *Bram v. United States,* 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897).

If we belabor this early history of confession law and the frequent cross-references among the English cases, the academic authorities, the Supreme Court, and the Court of Appeals, it is to underscore the point that the Supreme Court and the Court of Appeals had both adopted and were both applying precisely the same English common law.

## B. 1936–1966:

It was in 1936 that the Supreme Court for the first time undertook to review the issue of challenged confessions in convictions coming out of the state courts. *Brown v. Mississippi*, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936), utilized the Due Process Clause of the Fourteenth Amendment to reverse a conviction resting in significant measure on a coerced confession. The Due Process Clause, of course, is, by its very terms, binding on the states. During the twenty-eight years that followed, through the decision of *Haynes v. Washington*, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963), the Supreme Court decided thirty-five cases involving challenged confessions that had been admitted in trials in the state courts.

Notwithstanding the arrival of a new constitutional standard on the field, for more than a decade following *Brown v. Mississippi* Maryland continued to rely exclusively upon common law voluntariness without so much as mentioning the Due Process Clause. *Markley v. State*, 173 Md. 309, 196 A. 95 (1938); *Wright v. State*, 177 Md. 230, 235–236, 9 A.2d 253 (1939); *Lubinski v. State*, 180 Md. 1, 22 A.2d 455 (1941); *Taylor v. State*, 187 Md. 306, 49 A.2d 787 (1946); *Jones v. State*, 188 Md. 263, 268, 52 A.2d 484 (1947); *Cox v. State*, 192 Md. 525, 532–537, 64 A.2d 732 (1949). *Hammond v. State*, 174 Md. 347, 354–355, 198 A. 704 (1938), not only looked to all of its predecessor Maryland decisions on the subject of voluntariness but nostalgically reinvoked the old English stalwart of *Regina v. Baldry*, 2 Denison Cr.C. 428 (1852). In *Smith v. State*, 189 Md. 596, 603–604, 56 A.2d 818 (1948), Judge Grayson articulated what became thereafter Maryland's standard definition of the common law voluntariness:

"The law regarding the admissibility of a confession has been stated by this court many times. We will restate the rule. Before a confession can be admitted in evidence, the State must show, to the satisfaction of the court, that it was the free and voluntary act of an accused; that no force or coercion was exercised by the officers obtaining the confession, to cause the accused to confess; that no hope or promise was held out to an accused for the purpose of inducing him to confess."

For the next decade, that became the standard definition of common law voluntariness that was regularly quoted with approval in the case law. *Linkins v. State,* 202 Md. 212, 222, 96 A.2d 246 (1953); *Glover v. State,* 202 Md. 522, 525, 97 A.2d 321 (1953); *Cooper v. State,* 205 Md. 162, 168, 106 A.2d 129 (1954); *Kier v. State,* 213 Md. 556, 561, 132 A.2d 494 (1957). The standard statement of the rule then became *Abbott v. State,* 231 Md. 462, 465, 190 A.2d 797 (1963):

"The rule regarding the admissibility of a confession is that the State must prove that it was freely and voluntarily given and that it was not the product of force or of a promise, threat or inducement whereby the accused might be led to believe that there would be a partial or total abandonment of prosecution."

The statement from *Abbott* was quoted *verbatim* in *Bean v. State,* 234 Md. 432, 439, 199 A.2d 773 (1964), and cited with approval in *Combs v. State,* 237 Md. 428, 435, 206 A.2d 718 (1965); *Mercer v. State,* 237 Md. 479, 484, 206 A.2d 797 (1965), and *Mundell v. State,* 244 Md. 91, 93, 223 A.2d 184 (1966).

For the entire three decades between *Brown v. Mississippi,* 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936), and *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the time when Fourteenth Amendment due process was the standard by which the Supreme Court assessed the admissibility of confessions in state trials, the overwhelming majority of Maryland appellants did not raise the constitutional claim, although references were frequently made to some of the prominent Supreme Court decisions as persuasive authority.

The vast majority of the Maryland cases were decided exclusively on the basis of common law voluntariness. To be sure, some of the more prominent Supreme Court opinions such as *Malinski v. New York,* 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029 (1945); *Haley v. Ohio,* 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948); *Watts v. Indiana,* 338 U.S. 49, 69 S.Ct. 1347, 93 L.Ed. 1801 (1949); *Turner v. Pennsylvania,* 338 U.S. 62, 69 S.Ct. 1352, 93 L.Ed. 1810 (1949); *Harris v. South Carolina,* 338 U.S. 68, 69 S.Ct. 1354, 93 L.Ed. 1815 (1949); *Blackburn v. Alabama,* 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960); *Culombe v. Connecticut,* 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961), and *Haynes v. Washington,* 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963), were periodically cited as persuasive authority in line with the Maryland voluntariness standard.

Throughout the three decades, the Maryland cases assessing common law voluntariness entertained as sweeping and varied a totality of circumstances as did the Supreme Court under the Due Process Clause. Before the 1930's had waned, the Court of Appeals evaluated voluntariness in *Markley v. State,* 173 Md. 309, 316–319, 196 A. 95 (1938) (assurance of secrecy had been offered as an inducement); *Hammond v. State,* 174 Md. 347, 354–355, 198 A. 704 (1938) (low I.Q. of confessing suspect); and *Wright v. State,* 177 Md. 230, 234–236, 9 A.2d 253 (1939) (twenty hours of solitary confinement before the confession coupled with the threat of seven years in jail if no confession given).

In the 1940's, common law voluntariness was the basis for decision in *Lubinski v. State,* 180 Md. 1, 4–8, 22 A.2d 455 (1941) (inducement of "It will help you a lot"); *Taylor v. State,* 187 Md. 306, 310–312, 49 A.2d 787 (1946) (threat of violence and claim of actual beating); *Jones v. State,* 188 Md. 263, 268–271, 52 A.2d 484 (1947) (suspect held under arrest and without counsel; threat of mob violence); *Smith v. State,* 189 Md. 596, 603–606, 56 A.2d 818 (1948) (claim of threatened beating); and *Cox v. State,* 192 Md. 525, 531–537, 64 A.2d 732 (1949) (defendant not taken promptly before committing magistrate).

The 1950's produced a variety of decisions based on the voluntariness standard: *White v. State*, 201 Md. 489, 491–493, 94 A.2d 447 (1953) (prolonged interrogation and physical violence over three-day period); *Linkins v. State*, 202 Md. 212, 218–224, 96 A.2d 246 (1953) (youth of confessing suspect); *Glover v. State*, 202 Md. 522, 525–532, 97 A.2d 321 (1953) (claim of actual violence); *Cooper v. State*, 205 Md. 162, 167–169, 106 A.2d 129 (1954) (fear based on earlier threats); *Kier v. State*, 213 Md. 556, 559–563, 132 A.2d 494 (1957) (implied threat of physical harm); *Merchant v. State*, 217 Md. 61, 69–70, 141 A.2d 487 (1958) (prolonged questioning and admonition to "tell the truth").

Even the truncated decade of the 1960's prior to the promulgation of *Miranda* in 1966 was prodigious in its production of decisions based on common law voluntariness: *Glaros v. State*, 223 Md. 272, 277–278, 164 A.2d 461 (1960) (general questions about absence of threats, violence, or promises enough to satisfy State's burden); *Presley v. State*, 224 Md. 550, 558–562, 168 A.2d 510 (1961) (denial of telephone call to lawyer); *Ralph v. State*, 226 Md. 480, 485, 174 A.2d 163 (1961) (prolonged questioning); *Jones v. State*, 229 Md. 165, 168–174, 182 A.2d 784 (1962) (threat to arrest common-law wife); *Bryant v. State*, 229 Md. 531, 535–536, 185 A.2d 190 (1962) (suspect under influence of heroin); *Miller v. State*, 231 Md. 158, 161–162, 189 A.2d 118 (1963) (absence of counsel); *Bagley v. State*, 232 Md. 86, 92–94, 192 A.2d 53 (1963) (confession made while suspect bound or handcuffed); *Bean v. State*, 234 Md. 432, 439–444, 199 A.2d 773 (1964) (lack of sleep, food, or drink by fifteen-year-old with I.Q. of 74); *Wiggins v. State*, 235 Md. 97, 101–103, 200 A.2d 683 (1964) (alcoholic suspect with delirium tremens); *Thiess v. State*, 235 Md. 541, 543–544, 201 A.2d 790 (1964) (denial of telephone call); *Combs v. State*, 237 Md. 428, 435–436, 206 A.2d 718 (1965) (intellectual deficiency and emotional imbalance); *Mercer v. State*, 237 Md. 479, 483–484, 206 A.2d 797 (1965) (physical abuse); *Smith v. State*, 237 Md. 573, 580–582, 207 A.2d 493 (1965) (threat to arrest common-law wife); *Streams v. State*, 238 Md. 278, 281–282, 208 A.2d 614 (1965) (promise to take youthful suspect

home); *Campbell v. State,* 240 Md. 59, 61–64, 212 A.2d 747 (1965) (suspect on painkilling drug); *Mundell v. State,* 244 Md. 91, 93, 223 A.2d 184 (1966) (suspect advised of right to silence and right to seek a lawyer).

Beginning by the mid–1940's, however, the Due Process Clause also made its appearance in the Maryland decisions. *Peters and Demby v. State,* 187 Md. 7, 14, 48 A.2d 586 (1946) and *Day v. State,* 196 Md. 384, 396–398, 76 A.2d 729 (1950), were two cases that, in discussing the admissibility of confessions, amorphously combined the Maryland voluntariness cases and the federal due process cases with random interchangeability. *James v. State,* 193 Md. 31, 37–45, 65 A.2d 888 (1949), produced a somewhat muddled discussion, mixing recent English and Canadian cases, federal due process cases, federal cases construing a federal statute and the so-called *McNabb–Mallory* rule, and the prior Maryland cases. Without any clear statement of what law was being applied, the Court of Appeals simply found "no basis for reversing the trial judge's finding of fact that this confession was voluntary and admissible." *James,* 193 Md. at 44, 65 A.2d 888.

*Grear v. State,* 194 Md. 335, 71 A.2d 24 (1950), was an opinion in which a discussion of Maryland case law was intermingled with the decisions of three Supreme Court due process cases. In the last analysis, the Court of Appeals rejected the defendant's contention that his confession should not have been received in evidence, essentially holding that the Due Process Clause had not been violated.

In *Edwards v. State,* 194 Md. 387, 391–393, 71 A.2d 487 (1950), the Court of Appeals used an essentially due process approach in holding that a confession was not vitiated by the failure of the police to take the suspect promptly before a magistrate. The Court of Appeals, however, utilized common law voluntariness to hold that the confession was admissible. *Edwards,* 194 Md. at 396–398, 71 A.2d 487. The Court undertook an extensive review of the early English cases and of the earliest Maryland authorities. Interestingly, the one out-of-state authority cited along with the early Maryland

cases was the Supreme Court decision of *Bram v. United States*, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897), which was not a due process case but one involving the Fifth Amendment Privilege Against Compelled Self–Incrimination.

*Driver v. State*, 201 Md. 25, 29–31, 92 A.2d 570 (1952), was a decision which, by its very terms, turned upon the Fourteenth Amendment Due Process Clause. Three Supreme Court due process opinions were posited as controlling. The *Driver* opinion itself, however, went on to rely upon six Maryland voluntariness cases as guidelines in analyzing the federal due process claim. *Hyde v. State*, 228 Md. 209, 224–226, 179 A.2d 421 (1962), was a decision that seemed to turn, *sub silentio*, exclusively on the Due Process Clause. All of the cases cited in the opinion were Supreme Court due process cases. The literal holding, however, sustained the trial judge "in his finding that the confession was freely and voluntarily made and not coerced." *Hyde*, 228 Md. at 224, 179 A.2d 421. Perhaps implicit in that holding is that the two standards are the same and it makes no difference which is being technically employed.

The random wandering back and forth across the common law voluntariness/federal due process line continued in *Grammer v. State*, 203 Md. 200, 218–225, 100 A.2d 257 (1953). No less than five Supreme Court due process cases entered prominently into the analysis. They were freely mixed with Maryland voluntariness decisions, however, and the bottom-line test was in the familiar language of the common law:

> "The State must show to the satisfaction of the Court that the confession was a free and voluntary act of the accused and that in obtaining it, there was no force or coercion used and no hope or promise held out as an inducement."

*Grammer*, 203 Md. at 218, 100 A.2d 257.

*Jackson v. State*, 209 Md. 390, 394–395, 121 A.2d 242 (1956), was an inextricably mixed discussion of Maryland voluntariness opinions and Supreme Court due process opinions. In *Hall v. State*, 223 Md. 158, 169–172, 162 A.2d 751 (1960), Supreme Court due process cases were cited at length before

the holding that the confessions "were made voluntarily and were obtained without the use of force or violence, threats or coercion (physical or mental) and without holding out or offering any inducements . . . therefor." *Hall*, 223 Md. at 172, 162 A.2d 751. Moreover, the frequently cited articulation of the voluntariness standard by Judge Grayson in *Smith v. State*, 189 Md. 596, 603–604, 56 A.2d 818, was both quoted and set out as the controlling standard. *Hall*, 223 Md. at 169, 162 A.2d 751.

What emerges from the Maryland case law is the unmistakable impression that the decisions in all of those cases would have come out exactly as they did regardless of whether they were analyzed in terms of 1) Fourteenth Amendment Due Process, 2) common law voluntariness, or 3) some undifferentiated combination of them both. The choice of formal doctrinal label, even when such choice was made, turns out to have been a distinction without a difference. The ultimate test of admissibility was the same: "Was the statement free and voluntary, in that it was not the product of force, violence or other coercion and not the product of threats or promises or other inducement?" There was no suggestion in any of the Maryland decisions that the outcome ever hinged on the choice of formal criteria. Indeed, there was no suggestion that such a formal choice of criteria was even called for, as the opinions roamed casually back and forth among Maryland, federal, and common law authorities and randomly selected pertinent precedents from any of those jurisdictional settings.

### What Does Miranda Implement?

A sea change occurred in 1966 with the promulgation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.E.2d 694. *Miranda* did not establish a new standard; it prescribed a uniform and more efficient means for implementing an old standard. It did so, moreover, not in all circumstances but only in the particular circumstance of custodial interrogation. In any other circumstance, the method for satisfying the old standard remained unchanged.

In an effort to streamline the adjudicative process and to eliminate much of the profligate expenditure of time and resources that had theretofor been plaguing the courts under the "totality of circumstances" approach, *Miranda* first established a bright-line formula. From the very fact of custodial interrogation, the hearing judge must presume the initial presence of involuntariness/compulsion. Compulsion no longer had to be proved on a case-by-case basis, requiring a look at the multitudinous influences working on each suspect and a look, as well, at the multitudinous internal factors indicative of the resilience or resistance level of each individual suspect. As a bright-line rule, such compulsion or involuntariness would now be presumed. "Unless adequate protective devices are employed to dispel the *compulsion inherent in custodial surroundings*, no statement obtained from the defendant can truly be the product of his free choice." *Miranda*, 384 U.S. at 458, 86 S.Ct. at 1619 (emphasis supplied). "[W]ithout proper safeguards the process of *in-custody interrogation* of persons suspected or accused of crime *contains inherently compelling pressures* which work to undermine the individual's will to resist and *to compel him to speak* where he would not otherwise do so freely." *Miranda*, 384 U.S. at 467, 86 S.Ct. at 1624 (emphasis supplied). *Miranda* then established, with its familiar catechism and attendant waiver requirement, a set of easily administered "litmus paper tests," which the prosecution would not be permitted to shortcut but which, if satisfied, would dissipate or rebut the presumptive involuntariness/compulsion.

If then, in the circumstance of custodial interrogation, *Miranda* did not simply supplement but fully implemented and protected an undergirding constitutional and/or common law standard, what precisely was the standard thus being implemented? Was it only the Fifth Amendment privilege or did *Miranda* also implement Fourteenth Amendment due process? Was there, indeed, any difference between the Fifth and Fourteenth Amendment protections? Did, moreover, either or both incorporate common law voluntariness? Would or would not *Miranda*, when invoked and satisfied, thereby

coincidentally protect Maryland's common law guarantee of voluntariness as well? For something more than a glib seat-of-the-pants answer, we must drop back and trace the development of common law voluntariness following its 1884 implantation on federal soil even as we have traced it following its 1873 implantation on Maryland soil.

### The Equation of Common Law Voluntariness With The Privilege Against Self-Incrimination

Relying totally on the landmark English cases and on the well recognized academic authorities, *Hopt v. Utah* adopted in 1884, as we have seen, the same common law test of voluntariness that Maryland had adopted in 1873. *Sparf v. United States* (1895), *Pierce v. United States* (1896), and *Wilson v. United States* (1896) followed as routine applications of the common law test.

In 1897, however, *Bram v. United States*, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568, produced a seismic shift of the tectonic plates, though it did so without rattling in any way the surface test. In terms of basic doctrinal predicates, *Bram* declared that, as applied to confessions, the Fifth Amendment privilege and the common law voluntariness test were one and the same:

> "In criminal trials, in the courts of the United States, where-ever a question arises whether a confession is incompetent because not voluntary, the issue is controlled by that portion of the Fifth Amendment to the Constitution of the United States, commanding that no person 'shall be compelled in any criminal case to be a witness against himself.' "

*Bram*, 168 U.S. at 542, 18 S.Ct. at 187.

*Bram* left no doubt that the test of voluntariness, now embodied within the Fifth Amendment privilege, was the traditional common law test of voluntariness. "The legal principle by which the admissibility of the confession of an accused person is to be determined is expressed in the text-books." *Id.* As a statement of the voluntariness test, *Bram* quoted with approval 3 *Russell on Crimes* 478 (6th ed.):

"But a confession, in order to be admissible, must be free and voluntary: that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. A confession can never be received in evidence where the prisoner has been influenced by any threat or promise."

*Bram,* 168 U.S. at 542–543, 18 S.Ct. at 187. *Bram* observed that "this summary of the law is in harmony with the doctrine as expressed by other writers," 168 U.S. at 543, 18 S.Ct. at 187, citing 1 *Greenleaf on Evidence* § 219 (15th ed.); *Wharton's Criminal Evidence* § 631 (9th ed.); 2 *Taylor's Evidence* § 872 (9th ed.) (this was the single textbook relied on by Maryland in *Nicholson v. State*); 1 *Bishop's New Criminal Procedure,* § 1217.

*Bram* then pointed out that "[t]hese writers but express the result of a multitude of American and English cases." 168 U.S. at 543, 18 S.Ct. at 187. It cited *Hopt v. Utah, Sparf v. United States, Pierce v. United States,* and *Wilson v. United States,* its own cases utilizing the common law voluntariness test. Turning to the state cases and "content[ing itself] with a brief reference to a few leading and well considered cases treating of the subject of inducements, and which are, therefore, apposite to the issue now considered," *Bram,* 168 U.S. at 559, 18 S.Ct. at 193, the Court in *Bram* both cited and quoted from *Biscoe v. State,* 67 Md. 6, 8 A. 571 (1887). *Bram,* 168 U.S. at 560, 18 S.Ct. at 193.

*Bram* characterized the Fifth Amendment privilege as "but a crystallization" of the common law voluntariness doctrine:

"A brief consideration of the reasons which gave rise to the adoption of the Fifth Amendment, of the wrongs which it was intended to prevent and of the safeguards which it was its purpose unalterably to secure, will make it clear that *the generic language of the Amendment was but a crystallization of the doctrine as to confessions,* well settled when the Amendment was adopted, and since expressed in the text writers and expounded by the adjudications, and hence that *the statements on the subject by the text writers and*

*adjudications but formulate the conceptions and commands of the Amendment itself."* (emphasis supplied).

168 U.S. at 543, 18 S.Ct. at 187. It recounted how the "well settled nature of the rule in England at the time of the adoption of the constitution and of the Fifth Amendment, and the intimate knowledge had by the framers of the principles of civil liberty which had become a part of the common law, aptly explain the conciseness of the language of that Amendment" and that "the doctrine as to confessions as now formulated embodies the rule existing at common law and embedded in the Fifth Amendment." 168 U.S. at 548, 18 S.Ct. at 189.

Among the multitudinous English authorities cited and quoted were *Rex v. Kingston,* 4 Car. & P. 387 (1830), relied on by *Biscoe v. State,* 67 Md. 6, 8 A. 571 (1887), and *Regina v. Baldry,* 2 Denison Cr.C. 428 (1852), relied on not only by *Biscoe v. State* but also by *Young v. State,* 90 Md. 579, 45 A. 531 (1900) and *Hammond v. State,* 174 Md. 347, 198 A. 704 (1938). It is not without significance that, over the decades, the Maryland opinions have looked to *Bram* as a leading authority on the common law test of voluntariness. *Watts v. State,* 99 Md. 30, 36, 57 A. 542 (1904); *McCleary v. State,* 122 Md. 394, 399, 89 A. 1100 (1914); *Edwards v. State,* 194 Md. 387, 396, 71 A.2d 487 (1950); *Keller v. State,* 2 Md.App. 623, 627 n. 1, 236 A.2d 313 (1967); *State v. Kidd,* 281 Md. 32, 35 n. 2, 375 A.2d 1105 (1977); *Reynolds v. State,* 327 Md. 494, 506, 610 A.2d 782 (1992). The process of cross-referencing and cross-fertilization between the Maryland voluntariness cases and the Supreme Court cases dealing with the amalgamized voluntariness test and Fifth Amendment privilege has been going on continually for ninety-five years.

Although Wigmore was skeptical of the historical accuracy of *Bram*'s analysis, the Supreme Court indisputably equated the Fifth Amendment privilege with common law voluntariness. As stated in *McCormick* § 147, at 373:

"Only thirteen years after *Hopt,* the Court—in *Bram v. United States*—commented that whenever in federal criminal trials an issue arises as to the voluntariness of a

confession, 'the issue is controlled by that portion of the Fifth Amendment to the Constitution of the United States, commanding that no person "shall be compelled in any criminal case to be a witness against himself." ' The Amendment, continued the Court, embodied the common law rule of voluntariness." (footnotes omitted).

*Burdeau v. McDowell,* 256 U.S. 465, 475, 41 S.Ct. 574, 65 L.Ed. 1048 (1921), confirmed that the "Fifth Amendment ... protects from extorted confessions." In excluding an involuntary confession in a federal trial, *Ziang Sung Wan v. United States,* 266 U.S. 1, 45 S.Ct. 1, 69 L.Ed. 131 (1924) was a routine application of the *Bram* test. *See also Smith v. United States,* 348 U.S. 147, 153, 75 S.Ct. 194, 99 L.Ed. 192, 198 (1954).

Although in the wake of *Bram* the Supreme Court opinions dealing with confessions in federal trials were relatively few, they did make very clear their concern with such indirect compulsion as promises and inducements as well as with more obvious compulsion such as threats or violence. *Hardy v. United States,* 186 U.S. 224, 22 S.Ct. 889, 46 L.Ed. 1137 (1902), observed that "statements which are obtained by coercion or threat *or promise* will be subject to objection." *Hardy,* 186 U.S. at 229, 22 S.Ct. at 891 (emphasis supplied). The Supreme Court, citing *Bram,* was able to affirm the conviction before it for review as it held:

> "Affirmatively and fully it appears that all that he said in the matter was said *voluntarily, without any inducement or influence of any kind* being brought to bear upon him." (emphasis supplied).

*Hardy,* 186 U.S. at 230, 22 S.Ct. at 905.

Although at first glance it might appear difficult to catalogue promises of reward and other affirmative inducements as forms of compulsion, the difference between a promise and a threat is really no more than a word game. The promise to confer a benefit *if* a confession is forthcoming is, *ipso facto,* a threat to withhold the benefit *if* the confession is not forthcoming. The only difference is one of diplomatic nicety in the

phraseology. A *conditional* promise is, by definition, a threat in the eventuality the condition is not satisfied. Indeed, as noted in *McCormick* § 148, at 378:

"In many situations, discussions lend themselves to characterization either as a representation that something undesired will occur if a confession is not given or that something desired will occur if the statement is forthcoming. Whether an interrogator's language will be construed as promising a benefit or as threatening a detriment in such situations is a matter of very subjective choice."

*United States v. Carignan*, 342 U.S. 36, 41, 72 S.Ct. 97, 97, 96 L.Ed. 48 (1951) pointed out that whether the federal exclusionary principle was based on the Fifth Amendment privilege or on common law voluntariness, the standard was the same: "The constitutional test for admission of an accused's confession in federal courts for a long time has been whether it was made 'freely, voluntarily and without compulsion or inducement of any sort.'"

In *Shotwell Manufacturing Co. v. United States*, 371 U.S. 341, 83 S.Ct. 448, 9 L.Ed.2d 357 (1963), the petitioners, convicted of income tax evasion, claimed that certain inculpatory evidence should have been suppressed because it was unconstitutionally induced by the Treasury Department's "voluntary disclosure policy." The policy was a representation that delinquent taxpayers could escape possible criminal prosecution by disclosing their derelictions before an investigation commenced. Although denying relief under the circumstances of that case, the Supreme Court made it very clear that the Fifth Amendment privilege guarded not only against "coercion" but against "promises" as well:

"We have no hesitation in saying that this principle also reaches evidence of guilt induced from a person under a governmental promise of immunity, and where that is the case such evidence must be excluded under the Self–Incrimination Clause of the Fifth Amendment. See Bram v. United States."

*Shotwell,* 371 U.S. at 347, 83 S.Ct. at 453. The Court restated the test from *Bram:*

> "The controlling test is that approved in *Bram:* ' "a confession, in order to be admissible, must be free and voluntary: that is, ... not ... obtained by any direct or implied promises, however slight." ' Evidence so procured can no more be regarded as the product of a free act of the accused than that obtained by official physical or psychological coercion."

*Shotwell,* 371 U.S. at 347–348, 83 S.Ct. at 453 (citations omitted). The Supreme Court concluded that the "admission into evidence did not offend the Self–Incrimination Clause of the Fifth Amendment." *Shotwell,* 371 U.S. at 350, 83 S.Ct. at 454.

*Brady v. United States,* 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970) used *Bram* and the Fifth Amendment privilege to test the voluntariness of a guilty plea following a plea bargain. After quoting *Bram's* command that a "free and voluntary" confession must not be one "obtained by any direct or implied promises, however slight," *Brady,* 397 U.S. at 753, 90 S.Ct. at 1471, the *Brady* opinion drew a salutary and necessary distinction between a confession given by an uncounseled suspect in a custodial setting and an agreement worked out with the aid of a lawyer in an official setting:

> "Bram is not inconsistent with our holding that Brady's plea was not compelled even though the law promised him a lesser maximum penalty if he did not go to trial. Bram dealt with a confession given by a defendant in custody, alone and unrepresented by counsel. In such circumstances, even a mild promise of leniency was deemed sufficient to bar the confession, not because the promise was an illegal act as such, but because defendants at such times are too sensitive to inducement and the possible impact on them too great to ignore and too difficult to assess. But Bram and its progeny did not hold that the possibly coercive impact of a promise of leniency could not be dissipated by the presence and advice of counsel, any more than Miranda v. Arizona, held that the possibly coercive atmosphere of the

police station could not be counteracted by the presence of counsel or other safeguards."

*Brady,* 397 U.S. at 754, 90 S.Ct. at 1472. At this juncture, we note tangentially that in several pages of thoughtful and well considered *dicta, Reynolds v. State,* 327 Md. 494, 504–507, 610 A.2d 782 (1992), paved the way for, in an appropriate case, keeping the Maryland voluntariness law similarly up to date. Judge Chasanow's opinion quoted from *Brady v. United States* and also cited numerous other authorities for the recognition of the critical difference between the possibly erosive effect of an inducement on the will to resist in an uncounselled, custodial setting and the tactical advantages that a counselled defendant should be entitled, and, indeed, encouraged to pursue in a plea bargaining setting. Without this *Brady–Reynolds* recognition of the new reality, the very institution of plea bargaining could not survive. No *negotiated* plea of guilty (the ultimate confession) could ever be deemed voluntary. *See also Wright v. State,* 307 Md. 552, 578–587, 515 A.2d 1157 (1986); *Ball v. State,* 57 Md.App. 338, 361–366, 470 A.2d 361 (1984), *rev'd in part on other grounds, Wright v. State,* 307 Md. 552, 515 A.2d 1157 (1986).

What appears with crystal clarity from this review of the years through 1964 is that the common law voluntariness test in the federal courts, encapsulated within the Fifth Amendment privilege, paralleled Maryland's unencapsulated voluntariness test in its concern with the erosive effects of promises and other inducements.

For most of their lives, however, the two voluntariness tests, though substantively indistinguishable, traveled separate paths. Even after *Bram* proclaimed the identity of common law voluntariness and the Fifth Amendment privilege, that constitutionalized version of the common law test had no direct impact on the states for almost seven decades because the Fifth Amendment privilege, of course, was not binding on the states. *Twining v. New Jersey,* 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97 (1908); *Snyder v. Massachusetts,* 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934); *Adamson v. California,* 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903 (1947); *Cohen v. Hurley,*

366 U.S. 117, 81 S.Ct. 954, 6 L.Ed.2d 156 (1961). That changed dramatically, however, in 1964. When *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), held that the Fifth Amendment privilege was binding on the states through the Fourteenth Amendment, *Bram* and its entire body of federal confession law, theretofore binding only on federal courts, was suddenly impressed upon the states.

Maryland thus became the recipient a second time over of the same body of confession law it had first acquired nine decades earlier. Emanating from Lord Mansfield in *Rudd's Case* in 1775 and from Baron Parke in *Regina v. Baldry* in 1852 and from numerous other common law progenitors, a single stem of legal tradition bifurcated in the late 1800's. One strand entered Maryland in 1873 with *Nicholson v. State.* The other strand entered the federal system in 1884 with *Hopt v. Utah,* was constitutionalized in 1897 with *Bram v. United States,* and was nationalized in 1964 with *Malloy v. Hogan,* thereby reaching Maryland for yet a second time, ninety-one years after its initial arrival. In a classically Shakespearean plot, identical twins, separated for almost a century, embarked on divergent odysseys but ultimately arrived at the same place. In a jurisdictional sense, of course, they are not identical. In its first manifestation, the voluntariness test could be changed at the next whim of the Legislature; in its second manifestation, on the other hand, it is constitutionally binding.

### *A 28–Year Sidetrack:*

#### *General Due Process*

Because the Supreme Court regularly declined, from *Twining v. New Jersey* in 1908 through *Cohen v. Hurley* in 1961, to deem the Fifth Amendment privilege to be part of the Due Process Clause of the Fourteenth Amendment (and, therefore, binding on the states), it had to look elsewhere for leverage when it undertook to review the admissibility of challenged confessions in state criminal trials. In 1936, *Brown v. Mississippi,* 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682, used as the

jurisdictional wedge the general provisions of the Due Process Clause. During the twenty-eight-year regime of general due process that followed, no less than thirty-five decisions were handed down by the Supreme Court involving confessions in state trials.

Under general due process review, the constitutional standard of admissibility for a confession was that it be "voluntary." *Rogers v. Richmond,* 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961); *Culombe v. Connecticut,* 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961). There was no suggestion in the case law that the word "voluntary" meant anything different in the Fourteenth Amendment context than the same word "voluntary" meant in the context of the Fifth Amendment privilege (and its subsumed common law voluntariness test), which was the standard by which the admissibility of challenged confessions was being judged in federal criminal trials. The general provisions of due process (Fourteenth or Fifth Amendment) were never utilized in reviewing federal convictions.

Appearances, however, might have suggested otherwise. During the relatively brief life of general due process, it maintained a far higher profile, quantitatively and qualitatively, than did its federal Fifth Amendment counterpart. During the almost seven-decade period between *Bram* in 1897 and 1964, less than a dozen opinions dealing with confessions in federal trials were placed on the books. In the less than three decades from 1936 to 1964, by contrast, a full thirty-five opinions dealing with confessions in state trials were placed on the books. The federal convictions, moreover, frequently involved relatively trivial offenses. The state convictions, on the other hand, frequently involved death sentences for rape and first-degree murder. Whereas the federal investigative excesses frequently involved relatively mild promises and subtle inducements, the state investigative excesses regularly involved prolonged and incommunicado detention, "third-degree" interrogation techniques, and, in the earlier cases at least, actual physical torture. The Supreme Court granted *certiorari* in notoriously "bad" cases. The Fourteenth

Amendment due process decisions naturally caught the full attention of state courts because of their binding effect upon them, whereas the decisions involving the Fifth Amendment privilege were low-visibility events happening in some foreign jurisdiction.

The fortuitous fact patterns of the due process cases posed a hidden snare for anyone, in the 1950's or 1960's, seeking to compare Maryland's common law voluntariness test with the federal test. There was first the problem that the "federal" standard might be taken to include only the then-binding due process cases and not the Fifth Amendment privilege cases. The next problem was that instead of looking back to the origins of a rule or test, one might attempt to extrapolate the test simply from the collected decisions. Looking at the due process cases alone, one might understandably (albeit erroneously) conclude that the so-called "federal" standard was concerned only with unconscionable investigative extremes such as force, violence, or threats and was not adequately sensitive, as was the state standard, to the subtler dangers of promises and inducements. One could easily conclude, therefore, that the state and federal standards were not the same. Such a conclusion would have been erroneous, but it would have been understandable.

Although the fact patterns involved in the cases selected for due process review between 1936 and 1964 had generally dealt with "sterner stuff," the voluntariness test itself was no different than the voluntariness test employed in reviewing federal convictions, the general common law test of voluntariness then embodied within the Fifth Amendment privilege. As to the immutability of the voluntariness test, whether utilized in a Fourteenth Amendment context or in a Fifth Amendment context, *Davis v. North Carolina,* 384 U.S. 737, 740, 86 S.Ct. 1761, 1763, 16 L.Ed.2d 895, 897–898 (1966) stated unequivocally:

"The standard of voluntariness which has evolved in state cases under the Due Process Clause of the Fourteenth Amendment is the same general standard which applied in federal prosecutions—a standard grounded in the policies of

the privilege against self-incrimination. *Malloy v. Hogan.*" (citation omitted).

In any event, the general due process period came to a grinding halt on June 15, 1964. On that day, *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653, reversed *Twining v. New Jersey* and its progeny and held that the Fifth Amendment privilege against compelled self-incrimination was, through the conduit of the Fourteenth Amendment, binding on the states. The Fifth Amendment privilege, which embodied the common law voluntariness test and which had been the only constitutional standard governing the admissibility of confessions in federal trials, now became the only constitutional standard governing the admissibility of confessions in federal and state trials alike.

The Supreme Court acknowledged that it had theretofore relied upon general due process only as an expedient because, under the rule of *Twining v. New Jersey,* the Fifth Amendment privilege had not been available in the state cases. With the overruling of *Twining,* however, any reliance on general due process came to an end. It is now, and has been since 1964, an anachronism even to speak of general due process in analyzing confession cases. The body of case law from the due process years, however, still has precedential value because the "voluntariness" test applied during the due process years was held to have been *in pari materia* with the still-prevailing "voluntariness" test of the Fifth Amendment privilege.

*Malloy v. Hogan* declared flatly, 378 U.S. at 7, 84 S.Ct. at 1493:

"[T]oday the admissibility of a confession in a state criminal prosecution is tested by the same standard applied in federal prosecutions since 1897, when, in *Bram v. United States,* the Court held that '[i]n criminal trials, in the courts of the United States, wherever a question arises whether a confession is incompetent because not voluntary, the issue is controlled by that portion of the Fifth Amendment to the Constitution of the United States, commanding that no

person "shall be compelled in any criminal case to be a witness against himself." ' " (citation omitted).

*Malloy v. Hogan* left no room for doubt that the controlling voluntariness test prohibited promises and inducements as surely as it prohibited threats and violence:

"Under the test, the constitutional inquiry is ... whether the confession was 'free and voluntary: that is, [it] must not be extracted by any sort of threats or violence, *nor obtained by any direct or implied promises, however slight,* nor by the exertion of any improper influence.' [quoting *Bram* ].... In other words the person must not have been compelled to incriminate himself." (emphasis supplied).

*Malloy,* 378 U.S. at 7, 84 S.Ct. at 1493. Indeed, *Miranda v. Arizona* noted that the safeguards against involuntary confessions had been the same under the Fifth and Fourteenth Amendments:

"The decisions of this Court have guaranteed the same procedural protection for the defendant whether his confession was used in a federal or state court."

*Miranda,* 384 U.S. at 464 n. 33, 86 S.Ct. at 1623 n. 33. In *State v. Kidd,* 281 Md. 32, 34–35, 375 A.2d 1105 (1977), Judge Orth spoke for a unanimous Court of Appeals in noting this identity:

"Any doubt that the admissibility in a state criminal prosecution is tested by the same standard, applied in federal prosecutions since 1897 under the *Bram* holding, was laid to rest by *Malloy v. Hogan.*" (footnote and citation omitted).

Let it be noted that the Fifth Amendment privilege had taken over as the single and controlling constitutional standard two years before *Miranda v. Arizona* entered the field.

### *The Penultimate Reduction*

With the ending of the due process period and still keeping, for the moment, the implementing case of *Miranda v. Arizona* to the side, our field of comparative study has been reduced to two objects:

1) The Fifth Amendment privilege

2) Common law voluntariness in Maryland

The general common law test of voluntariness, which the Supreme Court first adopted in *Hopt v. Utah* in 1884, was the test that *Bram v. United States* declared to be subsumed within the Fifth Amendment privilege. In *Miranda v. Arizona*, 384 U.S. at 461–462, 86 S.Ct. at 1620–1621, the Supreme Court quoted from *Bram* at great length and with approval. It made it clear, moreover, that the voluntariness test it (*Miranda*) was implementing in 1966 was the very test that *Bram* had constitutionalized in 1897:

> "In *Bram,* the Court reviewed the British and American history and case law and *set down the* Fifth Amendment *standard* for compulsion *which we implement today.*" (emphasis supplied).

*Miranda,* 384 U.S. at 461, 86 S.Ct. at 1621.

That *Hopt–Bram–Miranda* voluntariness test, which has been consistently applied by the Supreme Court from 1884 to the present, was precisely the same common law voluntariness test that *Nicholson v. State* recognized for Maryland in 1873. *State v. Kidd* was aware of this identity as it pointed out:

> "*The imposition* upon the state *of the federal constitutional prohibition against compelled self-incrimination effected no change in the voluntariness requirement followed by Maryland* for the admissibility of confessions and admissions. More than a century ago, in *Nicholson v. State,* 38 Md. 140, 153 (1873) this Court said that 'it is very clear upon all the authorities, that if the confession of the [accused] had been induced by any threat of harm, or promise of worldly advantage held out to him ... it ought to be excluded.'" (emphasis supplied).

*Kidd,* 281 Md. at 35, 375 A.2d 1105.

The *Kidd* opinion, moreover, made reference to our own opinion in *Dennis v. Warden,* 6 Md.App. 295, 297–300, 251 A.2d 909 (1969), for its thorough-going analysis of the relationship among the various rules. *Dennis,* equating 1) the common law voluntariness test as followed in Maryland, 2) the

Fourteenth Amendment due process test, and 3) the Fifth Amendment privilege test, observed:

> "*The voluntariness test was followed in this State* more than half a century *before it was applied in State prosecutions by the Supreme Court* of the United States. *Nicholson v. State,* 38 Md. 140 (1873). Today *the standard of voluntariness* which evolved by Supreme Court decisions in state cases under the due process clause of the fourteenth amendment *is the same* general standard which *applied in federal prosecutions—a standard grounded in* the policies of *the privilege against self-incrimination.*" (footnote omitted) (emphasis supplied).

*Dennis,* 6 Md.App. at 297, 251 A.2d 909.

No Maryland decision has ever pointed to a single difference between the common law voluntariness test as applied here and as applied by the Supreme Court.[2] *Hillard v. State,* 286 Md. 145, 406 A.2d 415 (1979), to be sure, chose to operate on the unsubstantiated assumption that there *might* be some difference, but eschewed any effort to make the comparison: "We in no way attempt in this case to evaluate whether federal or Maryland constitutional law establishes the same voluntariness test as that enunciated in this opinion." 286 Md. at 150 n. 1, 406 A.2d 415. *Hillard,* indeed, went out of its way to speculate about a possible difference in the federal constitutional standard and the traditional voluntariness standard in a

---

2. *Hillard v. State,* 286 Md. 145, 406 A.2d 415 (1979) and *Stokes v. State,* 289 Md. 155, 423 A.2d 552 (1980), did briefly threaten to divert Maryland from its parallel course with an unrealistically rigid notion of the erosive effect on voluntariness of inducements hammered out with the help of counsel in the course of bargaining for some advantage. *Wright v. State,* 307 Md. 552, 578–587, 515 A.2d 1157 (1986) and *Reynolds v. State,* 327 Md. 494, 504–507, 610 A.2d 782 (1992), however, effectively brought Maryland back in line with the Supreme Court's treatment of the same subject in *Brady v. United States,* 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). Stokes, for all its rigor, is actually very much in line with *Rogers v. Richmond,* 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961) and *Lynumn v. Illinois,* 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963). It does not establish that the Maryland and federal standards of traditional voluntariness are in any way out of line with each other.

case where such a difference was not remotely involved. The decision of Judge Wilner for this Court in *Hillard v. State*, 40 Md.App. 600, 392 A.2d 1181 (1978), was based exclusively on the traditional voluntariness standard that was part of the common law of Maryland. Both it and the opinion that reversed it applied the same standard. They simply came to different conclusions in the course of that application. The federal constitutional standard was not an issue in the case and the discussion with respect to bypassing it had no pertinence. Several post-*Hillard* Maryland decisions have also operated on the *Hillard* assumption that there might be a difference in the two standards, but they have failed to point to any.

We recognize the boldness of our present assertion that there is no difference between nonconstitutional voluntariness in Maryland and constitutional voluntariness in the Supreme Court, although there is solid support for such an assertion in *State v. Kidd*, 281 Md. 32, 375 A.2d 1105 (1977) and *Dennis v. Warden*, 6 Md.App. 295, 251 A.2d 909 (1969). Indeed, there is almost the inevitability of a Newtonian Law to the identity of the two tests: *Two things that begin the same, unless changed, remain the same.*

Both manifestations of the test sprang from the same source. There is no indication that either has mutated in any way from the prototype. There are numerous indications that both have remained unswervingly true to the original. The definitions of voluntariness enunciated by both the Supreme Court and the Maryland courts are indistinguishable from one another, just as they are both indistinguishable from the prototypical definition. The regular cross-referencing and cross-fertilization between the Supreme Court and the Court of Appeals over the decades, moreover, reinforces this identity.

Indeed, far from being a bold assertion, it may merely be a recognition of the wisdom of Judge Orth, a quarter of a century ago, in *Dennis v. Warden*, 6 Md.App. 295, 300, 251 A.2d 909 (1969):

"It is clear that *the rule established in this State is in accord with the voluntariness test followed by the Supreme Court.* The basic standard governing the admissibility of an extrajudicial statement is whether, considering the totality of the circumstances, the statement was voluntary ... To be voluntary, a statement cannot be "extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." ' *Keller v. State,* 2 Md.App. 623, 626–627 [236 A.2d 313 (1967) ], quoting *Malloy v. Hogan,* 378 U.S. 1, 7, [84 S.Ct. at 1493]." (emphasis supplied).

Between Maryland and the Supreme Court, the common law test of voluntariness appears in two different jurisdictional guises. Substantively, however, it is precisely the same test— just as it always has been. Substantively, therefore, the field of study is now reduced to a single object:

1. Common law voluntariness (in either its nonconstitutional or its constitutional guise)

■ If only a federal constitutional claim is made, the voluntariness test will be considered only in its Fifth Amendment guise. If only a Maryland evidentiary claim is made, the voluntariness test will be considered only in its common law guise. When both claims are made, however, presumptively the common substantive test of voluntariness need be considered only a single time, thereby disposing of it in both of its guises. A presumptively identical test for voluntariness need not be considered twice.

We use the qualifier "presumptively" to hedge against the unlikely but theoretical possibility that a defendant might be able to establish that the federal voluntariness test includes some requirement not found in the Maryland test or, conversely, that the Maryland voluntariness test includes some requirement not found in the federal test. In such event, the State would, of course, be obliged to satisfy the incremental requirement in order to prove that particular enhanced version of voluntariness. Beyond that, requiring the State to duplicate its satisfaction of two jurisdictional manifestations of

the same substantive voluntariness test would be a profligate squandering of scarce judicial and prosecutorial resources. The uncritical assumption that the two tests are dissimilar, when every indication is that they are not, would lead to a 100%, or at least a 98%, duplication of effort. A rebuttable presumption of similarity will adequately accommodate both interests or points of view. If a defendant can rebut the presumption by showing some slight variance between the two tests, let him do so. The State would then assume its rightful burden with respect to the non-overlapping extrusion.

### The Miranda Implementation

What remains to be seen is the effect of *Miranda v. Arizona's* implementing rules on that single test of traditional voluntariness. Depending, of course, on the way in which the issue is raised, it is clear that *Miranda* is not without potential influence on the assessment of even nonconstitutional voluntariness in Maryland. In *State v. Kidd,* 281 Md. 32, 35–36, 375 A.2d 1105 (1977), Judge Orth laid out the traditional Maryland definition of voluntariness. He denominated it as the test for "voluntariness in the traditional sense":

> "More than a century ago, in *Nicholson v. State,* 38 Md. 140, 153 (1873) this Court said that 'it is very clear upon all the authorities, that if the confession of the [accused] had been induced by any threat of harm, or promise of worldly advantage held out to him ... it ought to be excluded.' The crucial test was succinctly put in *Taylor v. State,* 238 Md. 424, 429, 209 A.2d 595 (1965): 'If freely and voluntarily given, it is admissible; if not, it is inadmissible.' For a statement to be the free and voluntary act of an accused, it must be obtained without force applied, coercion used, hope held out or promise made on the part of the authorities. *Abbott v. State,* 231 Md. 462, 465, 190 A.2d 797 (1963). In other words, a confession or admission is not 'voluntary' if it is the product of physical or psychological coercion. *This test has been referred to as voluntariness in the traditional sense, and we shall so refer to it here."* (emphasis supplied).

He went on to point out one of the inevitable effects of *Miranda's* implementing function:

> "*Miranda* impressed procedural safeguards on the traditional test of voluntariness."

*Kidd,* 281 Md. at 36, 375 A.2d 1105.

If the traditional voluntariness test is, as we have established, presumptively the same in the Maryland and federal courts, then *Miranda's* direct implementation of traditional voluntariness under the Fifth Amendment privilege is, coincidentally, a *de facto* and indirect implementation of that same traditional voluntariness under the Maryland common law. Whatever is done to the Fifth Amendment is done, as well, to its Maryland analogue. The focus of our inquiry is now narrowed, therefore, to the single question of, "What does *Miranda* do with respect to implementing Fifth Amendment voluntariness?"

For starters, what does it *not* do? It does not implement the Fifth Amendment voluntariness test except in the inherently compelling circumstance of custodial interrogation. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694, 706 (1966); *Berkemer v. McCarty,* 468 U.S. 420, 435–442, 104 S.Ct. 3138, 3147–3152, 82 L.E.2d 317, 331–336 (1984); *Illinois v. Perkins,* 496 U.S. 292, 296–299, 110 S.Ct. 2394, 110 L.Ed.2d 243, 250–252 (1990). Where, for a variety of reasons, *Miranda* is inapplicable as the implementing mechanism, the traditional standard of voluntariness still must be satisfied under the traditional totality-of-circumstances in order for an incriminating statement to be admissible. *Davis v. North Carolina,* 384 U.S. 737, 740, 86 S.Ct. 1761, 1763, 16 L.Ed.2d 895, 897 (1966) (Nonretroactivity of *Miranda* did "not affect the duty of courts to consider claims that a statement was taken under circumstances which violate the standards of voluntariness."); *Johnson v. New Jersey,* 384 U.S. 719, 730, 86 S.Ct. 1772, 16 L.Ed.2d 882, 890 (1966) (Prisoners not entitled to *Miranda* "may invoke a substantive test of voluntariness."); *Minnesota v. Murphy,* 465 U.S. 420, 427–429, 104 S.Ct. 1136, 1142, 79 L.Ed.2d 409, 419–420 (1984) (interrogation was non-

custodial; statement still must be voluntary rather than compelled.); *Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302, 315–317 (1991) (*Miranda* not involved where a prisoner talks to an undercover agent who is also a prisoner; incriminating statement nonetheless held to be "coerced" or "involuntary.")

In the special circumstance of custodial interrogation, on the other hand, *Miranda* does not simply implement and fully protect the traditional voluntariness standard; it goes beyond it by way of adding yet further safeguards. Traditional voluntariness does not insist upon, as an absolute, an advisement as to a right to silence or a warning that anything said may be used against the utterer, although they are, to be sure, relevant factors in the larger totality. Traditional voluntariness does not insist upon an advisement as the right to the presence of an attorney, although, again, it is a relevant factor in the totality. Even as a mere factor, traditional voluntariness never went so far as to consider the providing of an attorney at state expense as something even arguably called for. *Miranda* insists upon all of these.

There are, therefore, situations where the prosecution may fail to satisfy the additional and more rigorous dictates of *Miranda* and yet may pass with flying colors the less onerous test of traditional voluntariness. Where that is true, the *Miranda*-violative statement, inadmissible on the merits of guilt or innocence, is nonetheless sometimes admissible in rebuttal for purposes of impeaching testimonial credibility, provided that the less rigorous test of traditional voluntariness has been satisfied. That may call for a separate appraisal of traditional voluntariness. *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971); *Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975); *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *James v. Illinois,* 493 U.S. 307, 110 S.Ct. 648, 107 L.Ed.2d 676 (1990). *See also State v. Kidd,* 281 Md. 32, 375 A.2d 1105 (1977); *State v. Franklin,* 281 Md. 51, 375 A.2d 1116 (1977).

■ Because *Miranda* is a more demanding standard than is traditional voluntariness, it is quite possible to fail the *Miranda* test and yet pass the undergirding voluntariness test. *See, e.g., Harris v. New York, Oregon v. Hass, Kidd v. State, Franklin v. State.* Hence, a further examination of voluntariness is sometimes in order even after the *Miranda* test has been failed. If the prosecution has failed to satisfy the more rigorous *Miranda* test, all that that means *necessarily* is that the *Miranda*-violative statement will not be admitted on the merits of guilt or innocence as part of the State's case in chief. It is only if the State subsequently offers the *Miranda* violative statement for some lesser purpose that the further inquiry will be necessary. If the statement satisfies the less rigorous demands of traditional voluntariness even though it has not satisfied the incremental demands of *Miranda,* the statement may still be used for purposes of impeaching testimonial credibility as a prior inconsistent statement. If, on the other hand, the *Miranda* violative statement *also* violates the traditional voluntariness test, then such statement may not be used for any purpose. That second level of inquiry into traditional voluntariness, therefore, is sometimes necessary.

The converse, however, is not true. Where *Miranda* is both *applicable and satisfied,* the less demanding traditional voluntariness test (in its constitutional or non-constitutional guise) will coincidentally have been *ipso facto* satisfied in the process. The *voluntariness* of the statement, of course, will be inherent in the *voluntariness* of the *Miranda* waiver requirement. Holding a prisoner without food or water until he agrees to confess, for instance, would, of course, render any consequential confession involuntary. Similarly, holding that same prisoner without food or water until he agrees to waive his *Miranda* rights would, of course, render any consequential *Miranda* waiver equally involuntary. Promising "to work things out with the judge" or agreeing not to arrest a prisoner's wife only if a confession is forthcoming, would, of course, render any consequential confession involuntary. Similarly, promising "to work things out with the judge" or agreeing not

to arrest a prisoner's wife only if a *Miranda* waiver is forthcoming would, of course, render any consequential *Miranda* waiver equally involuntary. The quality of free will for either voluntary act is the same. The influences that would erode such free will in either circumstance are the same. Conversely, the satisfaction of the voluntariness test in either circumstance is the same.

The question suggests itself as to what the situation might be if the *Miranda* rights were fully understood and were voluntarily waived but a forbidden threat or promise was then made during the course of the subsequent interrogation. The answer is that it would equally offend the *Miranda* test and the traditional voluntariness test. Full compliance with the dictates of *Miranda* does not end with the giving of the rights and the obtaining of a voluntary waiver. It is further required that the police then honor any rights that are invoked. *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *Arizona v. Roberson*, 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988). One of the *Miranda*-based rights is that a prisoner, even if he agrees to participate in an interrogation, may terminate that interrogation at any time in the unfettered exercise of his free will. The introduction of coercive tactics into the process would be as destructive of the *Miranda* protections as it would be of traditional voluntariness. It is difficult to conceive of a circumstance where police behavior that would offend traditional voluntariness would not in the process offend *Miranda* as well. Presumptively, there are no such circumstances.

In looking to the standard or the mind-set that a trial judge or an appellate court should apply in assessing voluntariness, be it common law voluntariness or the voluntariness of a *Miranda* waiver, it is important to look to the mainstream of decisions over the decades and not to an occasional aberrational application. Using such an approach, the Supreme Court cases and the Maryland cases alike have essentially always looked at the totality of the circumstances. The concern is whether an improper influence, be it a threat or be it an inducement, has been the pivotal criterion in producing a

confession from one who would not have confessed but for that improper influence. Despite some uncharacteristically rigid language in *Hillard v. State,* 286 Md. 145, 406 A.2d 415 (1979), and *Stokes v. State,* 289 Md. 155, 423 A.2d 552 (1980) to the contrary, this has been the traditional and logical approach generally followed in Maryland. Unless the improper influence is the precipitating or catalytic agent for the confession, it is not fatal. If it is the precipitating or catalytic agent, it would be fatal even under the "totality of circumstances" test for it would have outweighed the other circumstances and would have overborne the suspect's reluctance to confess. In *Reynolds v. State,* 327 Md. 494, 509, 610 A.2d 782 (1992), Judge Chasanow thoroughly analyzed this necessity for an inducement's being the catalytic agent before it could be deemed fatal to the admissibility of the confession:

> "One common thread that runs through our cases is that the promise must have caused the suspect to confess. If a suspect did not rely on an interrogator's comments, obviously, the statement is admissible regardless of whether the interrogator had articulated an improper inducement. By definition, there would have been no 'inducement' at all, because the interrogator 'induced' nothing. See *Ralph v. State* [226 Md. 480, 174 A.2d 163 (1961)] in which we said, '[T]he court besides finding out whether an inducement held out to the accused should also ascertain whether he had been influenced by such inducement in making the confession.' We noted that there was nothing in that case 'to show what *effect* the statement had on the defendant.' 226 Md. at 486–87, 174 A.2d at 166 (emphasis added). *See also State ex rel. Collins v. Superior Court,* 145 Ariz. 493, 702 P.2d 1338, 1340 (1985) ('[T]he promise must *induce* the defendant to waive his fifth amendment rights. If defendant did not rely on the promise, he certainly was not induced by it to make a statement.') (Emphasis in the original."

In the *Reynolds* opinion, Judge Chasanow traced the history of the Maryland decisions and, citing a number of cases, pointed out that Maryland has traditionally used the

"totality of circumstances" approach even when assessing voluntariness under the traditional common law test. He observed, 327 Md. at 504, 610 A.2d 782:

"In harmony with the approach taken in federal constitutional analysis, Maryland has for the most part applied a 'totality of the circumstances' rule when appraising the voluntariness of confessions under state nonconstitutional law. *See Hoey v. State,* 311 Md. 473, 483, 536 A.2d 622, 627 (1988); *Lewis v. State,* 285 Md. 705, 721, 404 A.2d 1073, 1081 (1979). *See also State v. Kidd,* 281 Md. 32, 36, 375 A.2d 1105, 1108, *cert. denied,* 434 U.S. 1002, 98 S.Ct. 646, 54 L.Ed.2d 498 (1977)."

Judge Chasanow also noted " 'a pronounced trend away from' per se exclusion and 'toward a totality of the circumstances approach.' " *Reynolds,* 327 Md. at 506, 610 A.2d 782. He further cited 1 *McCormick on Evidence* § 154, in noting the "judicial rejection of the per se analysis in favor of a totality of the circumstances approach." We feel that the traditional "totality" test is the proper test to be employed and, indeed, always has been the test, notwithstanding occasional language that suggests a more rigid and almost prophylactic approach. Whatever name is given to the test, the result, by and large, comes out exactly the same way. To the extent to which there is a difference between the "tilt" in the *Reynolds* opinion and the "tilt" in the *Hillard* opinion, we find the reasoning permeating the *Reynolds* opinion and the authorities it quotes such as *Cole v. Lane,* 830 F.2d 104 (7th Cir.1987) and *Green v. Scully,* 850 F.2d 894 (2d Cir.1988), far more compatible with the long federal, Maryland and common law tradition and far truer to the only real concern: that to be admissible, the confession must be *voluntary.*

The voluntary decision to speak is indistinguishable from the voluntary waiver of the right not to speak. The voluntariness of a statement, under the one formulation, and the voluntariness of a *Miranda* waiver, under the other formulation, involve the same quality and degree of free choice. *See Colorado v. Connelly,* 479 U.S. 157, 169, 107 S.Ct. 515, 523, 93

L.Ed.2d 473, 485 (1986). *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410, 421 (1986) explained:

> "*Miranda* holds that '[t]he defendant may waive effectuation' of the rights conveyed in the warnings 'provided the waiver is made voluntarily, knowingly and intelligently.' ... First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception ... Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived."

*See also North Carolina v. Butler,* 441 U.S. 369, 373–376, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286, 292–294 (1979).

In *Patterson v. Illinois,* 487 U.S. 285, 292–297, 108 S.Ct. 2389, 2394, 101 L.Ed.2d 261, 272–275 (1988), the Supreme Court deemed a voluntary waiver of *Miranda* rights sweeping enough to include an implicit waiver of the Sixth Amendment right to counsel, as it quoted with approval from *Moran v. Burbine,* 475 U.S. at 422–423, 106 S.Ct. at 1141:

> "Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law."

When the State essays to prove that *Miranda* warnings were given and a voluntary *Miranda* waiver was obtained, a defendant has the full opportunity to controvert that voluntariness. *Greenwell v. State,* 32 Md.App. 579, 586–589, 363 A.2d 555 (1976). Any factor that a defendant might introduce on the issue of traditional voluntariness would be equally admissible and relevant on the issue of the voluntariness of the waiver of the *Miranda*-based right to silence and counsel. *White v. State,* 13 Md.App. 1, 13, 280 A.2d 283 (1971). And see the thorough discussion of the voluntariness of a *Miranda* waiver by Chief Judge Murphy (now Chief Judge of the Court of

Appeals) in *Brown v. State,* 3 Md.App. 313, 319–324, 239 A.2d 761 (1968). As *Fare v. Michael C.,* 442 U.S. 707, 724–725, 99 S.Ct. 2560, 2571–2572, 61 L.Ed.2d 197 (1979) explained:

> "[T]he question whether the accused waived his rights 'is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the Miranda case.' Thus, the determination whether statements obtained during custodial interrogation are admissible against the accused is to be made upon an inquiry into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel. This totality-of-the-circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved ... The totality approach permits—indeed, it mandates—inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." (citations omitted).

The concern that the traditional test of voluntariness has always shown for protecting a suspect from promises and inducements is equally a concern when assessing the voluntariness of a *Miranda* waiver. W. LaFave and J. Israel, *Criminal Procedure* § 6.9(c), at 308 (1985) points out:

> "*Miranda* also says it must be shown that the defendant did 'voluntarily waive his privilege,' and as to this the conduct of the police will be particularly relevant. In *Fare v. Michael C.,* the Court declared that the 'totality of the circumstances approach is adequate to determine whether there has been a waiver,' which indicates that *the two categories of inducement which were considered sufficiently compelling to render a resulting confession inadmissible under longstanding and traditional confessions law—promises and threats—have a like adverse effect upon Miranda waivers. Lower*

*courts have held waivers involuntary where obtained by a promise of some benefit or a threat of some adverse consequence."* (emphasis supplied) (footnotes omitted).

*See State v. McGrew,* 38 Or.App. 493, 590 P.2d 755 (1979).

■ When only a Maryland evidentiary challenge is made, a challenged statement must satisfy the traditional voluntariness standard in the traditional way. Where both a state and federal challenge is raised but *Miranda* is for some reason inapplicable, traditional voluntariness (in both guises) must be satisfied in the traditional way. Where, on the other hand, both a state and federal challenge is raised and *Miranda* is found to have been both applicable and satisfied, the underlying traditional voluntariness standard has been fully implemented and is, presumptively at least, fully satisfied in the process.

We are not unmindful that in the last decade we have sometimes, as a matter of appellate style, chosen to consider the traditional voluntariness test under the common law of Maryland before we have looked to the federal constitutional mandate. In retrospect, we consider that approach generally ill-advised. Faced with a choice between a short, efficient way to resolve an admissibility problem and a longer way to do the same thing, we think it expedient to try the short, efficient way first. Such a choice, moreover, is the one most likely to avoid a needless duplication of effort.

### *The Jury Instructions*

■ The appellant claims that the jury instructions on the admissibility of his confession were inadequate. He relies on *Bellamy v. State,* 50 Md.App. 65, 435 A.2d 821 (1981). We do not find *Bellamy* at all apposite. In *Bellamy,* the trial judge, at a suppression hearing, found a confession to be admissible. Then, in flagrant violation of *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), he refused to give the jury any instruction at all with respect to the confession. That total refusal to instruct was the basis for our reversal in *Bellamy.*

In the present case, by way of contrast, the jury was fully instructed as to the *Miranda*-based rights to which the appellant was entitled and as to which he had to be advised. It was fully instructed as to the knowing, intelligent and voluntary character of any waiver that it might find with respect to those rights. It was fully instructed that the State bore the burden of persuading it beyond a reasonable doubt that the confession was voluntary. It was fully instructed that it could not find the confession voluntary unless it found full compliance with *Miranda* including a knowing and voluntary waiver of the *Miranda*-based rights. In conformity with our legal analysis in this opinion, the jury was instructed as to every element necessary to a finding that the confession was voluntary.

In *Bellamy*, moreover, the trial judge's ruling that the appellant there had not generated a jury issue on the subject of promises or inducements was erroneous. "[I]t was inaccurate for the trial judge to conclude that the appellant testified that no inducements were made to him." *Bellamy*, 50 Md. App. at 70, 435 A.2d 821. We quoted some of the testimony showing an inducement and then held, *"On the basis of this testimony* ..., we conclude that the lower court committed reversible error in its failure to instruct the jury as to the voluntariness of the appellant's confession." *Id.* at 71, 435 A.2d 821 (emphasis supplied).

In the present case, by contrast, no instruction was denied on any sub-issue that was generated by the evidence. None of the additional instructions requested by the appellant dealt with matters that had been developed before the jury. Let it be carefully noted in this regard that facts brought out before the judge alone in a pre-trial suppression hearing, before a jury is even impanelled, are not facts that generate a jury issue calling for a jury instruction.

The appellant, for instance, testified at the pre-trial suppression hearing. When the circumstances surrounding the giving of the confession were replayed before the jury, however, the appellant did not testify. At the suppression hearing,

the appellant testified that when the statement was taken from him, he was sick from narcotic withdrawal and that the detective promised to take him to St. Joseph's Hospital after he gave a statement. None of that was brought out before the jury, however, and it did not, therefore, generate any issue calling for a jury instruction. Reciting an abstract laundry list of factors that might be relevant in other circumstances is not necessary if such factors are not pertinent to issues presented to the jury for resolution by it.

### Other Contentions

Mercifully, the appellant's other contentions may be disposed of more summarily. He also alleges:

2. that Judge Jacobson erroneously permitted him to be transported in and out of the courtroom in shackles in the presence of the jury;

3. that Judge Jacobson erroneously permitted the introduction of "unsanitized" mug shots; and

4. that Judge Jacobson erroneously denied his request for a postponement.

### The Shackling

The appellant refused to remain in the courtroom during the trial. Although the court did not indulge him in his ultimate desire to be taken "back to the institution" where the court then could "notify me by mail whatever decisions you all come to," it did permit him to remain outside the courtroom although in the courthouse. On three occasions, the appellant had to be brought back in so that witnesses could make in-court identifications. On those occasions, he was escorted into the courtroom handcuffed and shackled. That is the basis for his present complaint.

We begin our analysis by noting that the appropriate standard of appellate review is that of abuse of discretion. *Hunt v. State*, 321 Md. 387, 408, 583 A.2d 218 (1990), set it out clearly:

"We begin our analysis by noting that the trial judge has broad discretion in maintaining courtroom security. The courts uniformly rely upon an abuse of discretion standard for reviewing the action of trial judges in the matter of restraint....' *Bowers [v. State,]* 306 Md. [120] at 132, 507 A.2d [1072] at 1078 [ (1986) ]. *The reviewing court should not determine whether less stringent security measures were available to the trial court, but rather whether the measures applied were reasonable* and whether they posed an unacceptable risk of prejudice to the defendant. *Bruce v. State,* 318 Md. 706, 721, 569 A.2d 1254, 1262 (1990)." (emphasis supplied).

Security measures, such as the one undertaken in this case, are, as the Court of Appeals in *Hunt* pointed out, "inherently prejudicial and may be used only when there is a compelling state interest specific to the trial." *Id.* 321 Md. at 408, 583 A.2d 218. *Hunt* went on to point out three State interests that might qualify as being thusly "compelling":

"There are three essential state interests which may justify physically restraining a defendant: Preventing the defendant's escape, protecting those in the courtroom, and maintaining order in the courtroom. Unless one or more of these factors outweigh any prejudice to the defendant, physical restraint is inappropriate."

*Id.* 321 Md. at 410, 583 A.2d 218.

In the appellant's case, all three of those "essential state interests" conjoined. He was first, in the words of *Hunt,* "a significant escape risk." *Id.* On the day of trial, the Division of Corrections requested the permission of Judge Jacobson to keep the appellant in leg shackles during the trial. It represented to the judge that the appellant presented a serious security risk. It informed Judge Jacobson that the appellant had attempted escape on five occasions and had, in fact, fled within the last week when the correctional officers removed his shackles. Judge Jacobson was informed that the Division of Corrections had reason to believe that the appellant would try to escape that day. The Assistant State's Attorney,

moreover, informed the judge that the appellant had previous-
ly been convicted of escape. The Assistant State's Attorney
also informed the court that on the day when the appellant's
trial had previously been scheduled to start, the appellant had
feigned illness in order to be taken to the hospital, from which
he would have had a better chance of escape. *See Hunt,* 321
Md. at 410, 583 A.2d 218. ("While in prison he feigned an
illness so that he would be sent to the hospital to 'see what my
chances were for freedom.'")

When Judge Jacobson explained to the appellant the charac-
teristics of a jury trial and a court trial, respectively, and
asked the appellant to make an election, the appellant stood
mute and refused to respond. Judge Jacobson then explained
to the appellant his rights with respect to attending bench
conferences. When asked if he understood that explanation,
the appellant again stood mute and refused to respond.
Judge Jacobson ruled that the leg shackles would remain on
throughout the trial but that the sheriffs should position the
appellant so as to minimize the jury's view of him in shackles.
The appellant sat at the trial table, shackled, during *voir dire*
examination and the selection of the jury.

It was following jury selection that the other "compelling
state interests"—"protecting those in the courtroom and main-
taining order in the courtroom"—became apparent. Initially,
the appellant sought to dismiss the Assistant Public Defender
representing him. Judge Jacobson, after an extended collo-
quy with the appellant, concluded that his allegations against
his attorney were without merit and were made solely for the
purpose of delaying the trial. Judge Jacobson informed the
appellant that if he insisted on discharging his lawyer, he
would have to proceed to trial representing himself. It was at
that point that the appellant elected to leave the courtroom,
threatening violence if he was not permitted to do so:

"The Defendant: Your Honor, in that case, since you're
going to say it's without merit, I'm not, I don't get no
witnesses, I'm going to go back to the institution. When
you're all done, you just write me a letter, tell me how much

time I got and all that. I'm through with it. I'll deal with it on post-conviction or appeal. I'm gone.

Officer Watson: You're not dismissed.

The Defendant: *I'm leaving. Now, you all want to be violent—I'm leaving.* Take me back." (emphasis supplied).

Judge Jacobson explained to the appellant that if he left, the trial would proceed in his absence. The appellant agreed and insisted that he was leaving:

"The Court: Mr. Hof, if you voluntarily absent yourself from the trial of this case, this trial will proceed in your absence. Do you understand that, sir?

The Defendant: Yes, I do. I do understand.

The Court: Is that your election?

The Defendant: But I'm being denied a fair trial, period. That's why I'm leaving. Put that on the record.

The Court: Everything that is being said here is being said on the record, sir.

The Defendant: Okay. Now, can you tell these gentlemen to take me back to the institution and you all can notify me by mail whatever decisions you all come to? I ain't going to attend the sentencing hearing or nothing."

The Assistant State's Attorney then asked that the appellant be kept in the courthouse because three separate witnesses were going to be asked to make an in-court identification of him. The appellant insisted that he would not be brought into the courtroom for identification and threatened violence if an effort were made to bring him in:

"The Defendant: I will not be brought in here. I tell you now. If you all want to get violent.

The Court: Don't threaten violence, sir.

The Defendant: That's what's going to happen."

Clearly, Judge Jacobson did not abuse his discretion in taking the security measures he took in this case. The appellant goes on to complain, however, that Judge Jacobson was guilty of an abuse of discretion when he permitted the appellant to be escorted into the courtroom on the three

occasions when in-court identifications were to be made. Initially, Judge Jacobson had tentatively entertained the thought of sending the jury out of the room prior to each entrance of the appellant, bringing them back briefly for the identification, and then sending them out again before the appellant's exit. The appellant, before us, emphasizes heavily the fact that Judge Jacobson did not justify changing his mind. The appellant is focusing on the wrong question. Our only concern is whether the ultimate action of Judge Jacobson falls within his discretionary range or not. However many other options he may have considered before making his ultimate determination is of no concern to us.

Judge Jacobson made his procedural ruling and then indicated that the appellant would be given his option of returning to the trial table or insisting upon remaining away except for the occasions when in-court identifications were to be made:

"I indicated to both counsel that, in the course of their opening statements, I had been thinking about my ruling and had concluded that when the defendant voluntarily absents himself from a trial, and I have told the defendant that he will have to be made available for purposes of identification, and nevertheless, he decides to absent himself from the trial itself, he must accept the consequences of that voluntary act.

One of the consequences will be that he's going to have to be escorted in and out of this courtroom for purposes of identification by a deputy sheriff and a correctional officer. And I would ask that Mr. Zaremba at some point in this trial advise the defendant of this ruling so that he can maybe reconsider his decision to absent himself from this trial because I'm not going to, I'm going to accede to the State's request. I am not going to interrupt the trial and excuse the jury and bring the defendant in each time a witness is called on to look around the courtroom and see if they could see the person who committed this offense.

The defendant is going, if the defendant wishes to absent himself from the trial, he's going to have to submit to being escorted in and out of the courtroom by the deputies."

A recess was declared so that counsel could explain the options to the appellant. Counsel brought back the appellant's reply:

"Mr. Zaremba: I advised him that the Court has ruled that he will be brought in, escorted by deputies, while still shackled. He will be brought into the courtroom to be identified by the various witnesses that the State intends to call.

In light of that, I asked him whether he would reconsider his decision to be absent from this proceeding since he would be brought in under the possibly, or under these, under those circumstances. He told me that he still wishes to absent himself from the proceedings. He does not wish to be present.

The Court: Very well. He's made his election. Let's proceed."

We hold that Judge Jacobson's conduct of the in-court identifications was within his legitimate discretionary range. He kept the appellant informed at all times of the pros and cons of any decision, wise or foolish, the appellant might choose to make. He gave the appellant the opportunity to reconsider his position at any time. We note, moreover, that the appellant was not faced with some anguishing Hobson's Choice between sustaining prejudice, on the one hand, or foregoing a valuable right, on the other. The right to be present at one's trial does not imply a converse right to be absent from one's trial. The appellant's stubborn absence was nothing more than a willful display of noncooperation, disdain, and general contempt for the judicial process. A fair reading of the record permits but one conclusion: the appellant here was not some unskilled and helpless defendant but a clever and manipulative one, deliberately trying to toss enough of a monkey wrench into the machinery to compel appellate reversal. It would be a mockery of justice to permit such a subversive effort to succeed. We shall not do so.

### *"You Can't Make a Silk Purse Out of a Sow's Ear"*

The appellant complains that Judge Jacobson erroneously permitted the introduction of an unsanitized mug shot of the appellant and of five others who shared his photographic array. It is the lesson of *Arca v. State,* 71 Md.App. 102, 106, 523 A.2d 1064 (1987), that there is a limit to how much sanitizing can be done to mug shots: "Moreover, though 'doctored,' the photographs still showed the front and profile view commonly associated with police 'mug shots.'" The mug shots in question had, indeed, been mildly sanitized. The chest plates bearing the identifying numbers of each individual had been obliterated by "little black covers over the identification numbers." It is the appellant's position that the tell-tale character of the photographs was nonetheless plain and that the mug shots should have been cropped or cut off at the shoulder level so as not to reveal the chest plates, numbered or mysteriously blank. The real issue, however, is whether the photographs should have come in at all, not whether they could have been further sanitized. The familiar juxtaposition of the front view and the profile, not to mention flat lighting and a dozen other artistic flaws, would readily reveal, even in the absence of serial numbers, that these were not graduation photographs taken from a yearbook. As we observed in *Cobey v. State,* 73 Md.App. 233, 246, 533 A.2d 944 (1987):

> "Although the pictures were 'sanitized' by cutting off the chest plates appellant was holding in them, they 'still showed the front and profile view commonly associated with police "mug shots."'"

Even when it is clear that mug shots are mug shots, however, they are nonetheless frequently admissible in the discretion of the trial judge. The standard of admissibility has been well stated by Chief Judge Murphy in *Straughn v. State,* 297 Md. 329, 334, 465 A.2d 1166 (1983):

> "As a general rule, the admissibility of photographs in a criminal case is a discretionary matter for the trial court. The rule applies to police identification photographs. Therefore, the decision of a trial court to admit mug shots of

a defendant as substantive evidence will not be reversed absent a showing of a clear abuse of discretion. In the exercise of its discretion, the trial court must balance the probative value of the mug shots against their prejudicial impact on the defendant." (citations omitted).

*Straughn* was an excellent example of when a mug shot does have sufficient probative value to justify its admissibility notwithstanding some prejudicial impact on the defendant. Where identification is an issue and the mug shot that was selected pretrial helps, for example, to bolster the subsequent in-court identification, the probative value has been established. As *Straughn* observed:

"Turning to the particular facts of this case, we think it clear that the admission in evidence of the mug shots was not an abuse of the trial judge's discretion. There was a real need for the evidence in this case. *The prime issue at trial was the identity of the person who committed the crime. The entire photographic array was introduced in an effort to corroborate Saunders' in-court identification.*" (emphasis supplied).

*Id.,* 297 Md. at 336, 465 A.2d 1166.

The case before us is indistinguishable from *Straughn.* The lone armed robbery victim was the only witness who could "finger" the appellant as her assailant. She made an in-court identification of him but that was, of course, fifteen months after the fact. Under the circumstances, the selection of his photograph from the photographic array, made within two hours of the robbery, was strongly corroborative of her later in-court identification. We see no error.

### Nineteen Missing Witnesses

In his final contention, the appellant claims that Judge Jacobson abused his discretion when he refused to grant him a trial postponement. After the jury had been selected but before opening statements had been made, the appellant attempted to fire the Assistant Public Defender who had been representing him. As an incident of the requested firing, the

appellant asked for a postponement to obtain other counsel and to allow that other counsel to summons nineteen critical witnesses whom the appellant deemed to be essential to proving the "merits" of his defense. Indeed, it had been the failure of his then-present counsel to summons those nineteen that had led to the effort to dismiss him.

The appellant does not deign to tell us what those witnesses might have testified about or what knowledge they might have had of the merits of the case. In view of the fact that no defense was put on, it remains a mystery. The three-page opening statement of the defense, moreover, gave no clue, as it simply admonished the jury to view with scrutiny the identification made by the victim and only witness to the armed robbery.

When questioned about the nineteen witnesses at the time of the attempted firing, defense counsel pointed out that they had been requested by the appellant to testify at an earlier insanity hearing in a companion case. Even at that hearing, counsel had declined to summons all of them because, in his professional judgment, they could not contribute anything. Some of them, however, did appear.

There is no suggestion in the record before us who those witnesses may have been or what they would have been asked to testify about. Since the party requesting a postponement bears the burden of showing the need for the postponement, we cannot say that Judge Jacobson abused his discretion in denying a postponement for which no need was shown.

*JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.*